<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| |
|---|
| IN RE: SELENIOUS ACID LITIGATION |

Case No. 2:24-cv-07791 (BRM) (CLW)

**OPINION**

███████████████████████

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff American Regent, Inc.'s ("Plaintiff") Motion for a Preliminary Injunction against Defendants in this consolidated matter (the "Motion") (ECF No. 85), each of whom has filed an Abbreviated New Drug Application that Plaintiff alleges infringes on its Orange Book patents, U.S. Patent No. 11,998,565 (the "'565 Patent") and U.S. Patent No. 12,150,957 (the "'957 Patent").[1] Having reviewed the parties' submissions filed in connection with the Motion, having conducted a hearing on March 31, 2025 (ECF No. 163), and having considered the parties' post-hearing submissions (ECF Nos. 170, 171, 200, 201), for the reasons set forth below and for good cause having been shown, Plaintiff's Motion is **GRANTED**.

---

[1] Pursuant to the parties' stipulation, the Court originally consolidated thirteen suits filed by Plaintiff against different defendants into this action. (ECF No. 27.) As a result of new suits filed by Plaintiff that were later consolidated (ECF No. 54), consent judgments Plaintiff entered into with some parties, and one instance of a party withdrawing its Abbreviated New Drug Application (ECF Nos. 95 at 1 n.1, 152, 160, 164, 165, 168), the following entities remain in the consolidated action and will be referred to collectively as "Defendants": Aspiro Pharma LTD and Aspiro Pharma Ltd. ("Aspiro"); Cipla USA, Inc. et al. and Cipla USA, et al. ("Cipla"); RK Pharma, Inc. ("RK Pharma"); and Sun Pharmaceuticals Limited, et al. and Sun Pharmaceuticals Industries Limited, et al. ("Sun").

## I.   BACKGROUND

### A.   Statutory Background

"[T]he regulatory scheme that governs the testing and approval of new drugs in the United States" was established by the Hatch-Waxman Act ("Hatch-Waxman"), 21 U.S.C. § 355. *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 143 (3d Cir. 2017). Under Hatch-Waxman, a drug company can obtain Food and Drug Administration ("FDA") approval to market a drug in one of three ways. "First, a drug manufacturer[] wishing to market a new prescription drug[] must submit a New Drug Application" ("NDA") to the FDA "and undergo a long, comprehensive, and costly testing process, after which, if successful, the manufacturer will receive marketing approval." *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (citing 21 U.S.C. § 355(b)(1)). "In addition to extensive testing and safety information concerning the drug, the manufacturer must also submit the patent number and expiration date of any patent that claims the drug or a method of using the drug with respect to which a claim of patent infringement could reasonably be asserted." *Eisai Co. v. Mut. Pharm. Co.*, Civ. A. No. 06-3613, 2007 WL 4556958, at *1 (D.N.J. Dec. 20, 2007) (citing U.S.C. § 355(b)(1)). If an applicant's NDA is approved by the FDA, the patent information filed in connection with the NDA is published in the FDA's publication known as the "Orange Book." *Id.*

Second, to further its goal of "increas[ing] competition between generic and brand-name drugs," Hatch-Waxman "allows the manufacturers of generic drugs to obtain FDA approval without having to endure the gauntlet of procedures associated with NDAs." *In re Wellbutrin*, 868 F.3d at 143. Generic manufacturers may file an Abbreviated New Drug Application ("ANDA") "specifying that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug." *Actavis*, 570 U.S. at 142 (quoting *Caraco Pharm.*

*Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012)). An ANDA allows a generic manufacturer to "avoid[] the 'costly and time-consuming studies' needed to obtain approval 'for a pioneer drug,'" thereby furthering competition. *Id.* (quoting *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990)).

Third, a generic manufacturer may also submit a Section 505(b)(2) NDA, which "is appropriate for a company seeking to modify another company's brand-name drug." *F.T.C. v. AbbVie Inc.*, 976 F.3d 327, 339 (3d Cir. 2020); *see also* 21 C.F.R. § 314.54(a) (providing that examples of a brand-name drug modification may include "a new indication or new dosage form"). A Section 505(b)(2) NDA "is like an ANDA because the company need not produce all safety and efficacy data about the drug and because it must assure the FDA that its generic drug will not infringe the brand's patents," but differs "because the company must produce some data, including whatever 'information [is] needed to support the modification(s).'" *Id.* (quoting 21 C.F.R. § 314.54(a)).

"In addition to streamlining the drug approval process, the Hatch-Waxman Act provides specialized procedures for brand-name and generic drug manufacturers to resolve intellectual property disputes." *In re Wellbutrin*, 868 F.3d at 144. A brand-name manufacturer is required to list in its NDA "the 'number and the expiration date' of any relevant patent." *Actavis*, 570 U.S. at 143 (quoting 21 U.S.C. § 355(b)(1)). Generic manufacturers, on the other hand, must certify their products will not infringe upon the brand-name's patents, known as a "paragraph IV notice." *AbbVie*, 976 F.3d at 339; *see also* 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (certifying "that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted"). After receiving a paragraph IV notice, a brand-name manufacturer has forty-five days to decide whether to sue the generic manufacturer for patent infringement. *See* 21

U.S.C. § 355(j)(5)(B)(iii). Typically, if it decides to sue within forty-five days, the brand-name manufacturer "is rewarded with some breathing space before competition can begin: the FDA is required to withhold approval of the generic drug for 30 months or until the infringement case is resolved, whichever comes first." *In re Wellbutrin*, 868 F.3d at 144 (citing 21 U.S.C. § 355(j)(5)(B)(iii)).

### B. Factual Background

#### 1. Plaintiff's Selenious Acid Injections

Plaintiff is a pharmaceutical corporation with a principal place of business in New York State. (ECF No. 1 (Accord Healthcare, Inc. Compl.) ¶ 2.) Plaintiff has an NDA for "three unit forms of Selenious Acid Injection—(1) eq. 600 mcg Selenium/10 mL (eq. 60 mcg Selenium/mL); (2) eq. 60 mcg Selenium/mL (eq. 60 mcg Selenium/mL); and (3) eq. 12 mcg Selenium/2 mL (eq. 6 mcg Selenium/mL)" (the "Selenious Acid Injections"). (ECF No. 95 at 5–6.) The FDA approved this NDA—No. 209379—on April 30, 2019, and conferred it New Chemical Entity status, which guarantees "an initial five (5) years of market exclusivity following approval." (*Id.* at 6, 8.) However, the '565 and '957 Patents were issued later, on June 4, 2024, and November 26, 2024, respectively. *See* U.S. Patent No. 11,998,565 (filed Mar. 21, 2023) ("Pat. '565"); U.S. Patent No. 12,150,957 (filed May 23, 2024) ("Pat. '957"). The patents-in-suit are listed in the FDA's Orange Book. (ECF No. 95 at 1.) The '565 Patent describes the compositions of the Selenious Acid Injections, and the '957 Patent describes their methods of use. (*Id.* at 8.) Plaintiff contends "each Defendant infringes at least claims 1, 8, and 9 of the '565 [P]atent and claims 1, 6, and 9 of the '957 [P]atent." (*Id.*)

Selenium is a "trace element . . . essential to various biological processes, and a deficiency can result in serious and potentially life-threatening issues such as cardiomyopathy" in both

pediatric and adult patients. (*Id.* at 6.) The Selenious Acid Injections Plaintiff developed are directed at patients who are unable to obtain selenium "orally (*i.e.*, by mouth) or enterally (*i.e.*, through a feeding tube into the digestive tract), or for other reasons unable to absorb it through the digestive tract." (*Id.*) Instead, the Selenious Acid Injections allow administration of selenium parenterally, meaning through an injection directly into the bloodstream that bypasses the patient's digestive tract. (*Id.*) Plaintiff's Selenious Acid Injections are among the first FDA-approved products for administering trace elements, "and, to date, [the] only FDA-approved selenious product." (*Id.* at 6, 8.) Plaintiff contends its Selenious Acid Injections offer improvements over prior, non-FDA-approved trace element products by limiting the levels of impurities that might lead providers to inadvertently dose unintended amounts of other trace elements, identifying optimal doses of selenium and creating a composition to administer them, and improving stability to reduce potential waste and cost. (*Id.* at 6–7.)

Since launch, Plaintiff has made nearly ███████ in sales of Selenious Acid Injections, █████████████████████████████████████████████████████. (*Id.* at 10–11.) ████████████████████████████ ████████████ (*Id.* at 10.) Through the Selenious Acid Injections, Plaintiff asserts it has developed a niche in the "parenteral nutrition" market, creating a reputation as a "trusted supplier" and driving ████████████████████████ for Plaintiff. (*Id.* at 10–11.) Plaintiff claims that, if multiple generic versions enter the market before a merits decision on the infringement issue, ███████████████████████████ ████████████████████████████████████ (*Id.* at 11.)

## 2. Defendants' ANDAs

Defendants are generic pharmaceutical companies who submitted ANDAs to the FDA "seeking approval to make and sell generic copies of [Plaintiff's] Selenious Acid before the expiration of the '565 and '957 [P]atents," pursuant to 35 U.S.C. § 355(j)(2)(A)(vii)(IV) (the "ANDA Products"). (*Id.* at 8–9.) ANDAs submitted under this statutory framework require the generic maker to certify that, "'in the generic applicant's opinion and to the best of its knowledge,' the listed patent is 'invalid or will not be infringed' by the generic product." (*Id.* at 8 n.1 (quoting 35 U.S.C. § 355(j)(2)(A)(vii)(IV)).) Plaintiff then sued Defendants for infringement of both the '565 and '957 Patents under the Hatch-Waxman, 35 U.S.C. § 271(e)(2), which allows patent owners to sue generic ANDA filers before their competing products commercially launch. (*Id.* at 9.) Typically, infringement cases under Hatch-Waxman trigger a 30-month stay in FDA approval of the subject ANDA. (*Id.*; *see also* 21 U.S.C. § 355(j)(5)(B)(iii).) However, because Defendants filed their respective ANDAs "on or about April 30, 2024," and the '565 and '957 Patents were not issued and listed in the Orange Book until June and November 2024, respectively, the 30-month stay was not triggered.[2] (ECF No. 95 at 9.)

Plaintiff alleges "each Defendant infringes at least claims 1, 8, and 9 of the '565 [P]atent and claims 1, 6, and 9 of the '957 [P]atent." (*Id.* at 8.) Claim 1 of the '565 Patent claims

---

[2] The parties dispute the exact root of why the 30-month stay does not apply in this case. Plaintiff asserts it is the result of "an accidental clerical error by the U.S. Patent Office," outside of Plaintiff's control (ECF No. 95 at 2, 39), that "delayed patent issuance," without providing further specifics (ECF No. 131 at 19). In contrast, Defendants contend Plaintiff could have filed the '565 and '957 Patents applications near the time when the FDA approved its NDA for the Selenious Acid Injections in 2019 but chose to wait "nearly four years" until March 2023, pointing to related patents Plaintiff filed in July 2021 as evidence Plaintiff could have prosecuted the '565 and '957 Patents on a similar timeline. (ECF No 126 at 2–3.) At oral argument, the parties agreed resolving this question had no bearing on whether a preliminary injunction should issue. (ECF No. 170-2 (Apr. 7, 2025 Hr'g Trans.) at 9:19–11:6.)

> [a]n injectable composition comprising water, 6 μg or 60 μg of
> selenium, no chromium or chromium in an amount not to exceed 1
> μg, no aluminum or aluminum in an amount not to exceed 6 μg, no
> iron or iron in an amount up to 10 μg, and *fluoride in an amount of*
> *0.0001 μg to 2.7 μg per 1 mL of the injectable composition.*

'565 Pat. col. 71 l. 36–41 (emphasis added). As described in further detail below, the italicized

text describing a fluoride concentration is at the heart of Defendants' invalidity contentions for

both patents-in-suit, as well as their theories of non-infringement. (ECF No. 126.) The '565 Patent

Claims 8 and 9 depend on Claim 1, describing a composition of Claim 1 that has "a pH of 1.8 to

2.4" and one that "further comprises nitric acid," respectively. '565 Pat. col. 71 l. 60–63. Similarly,

Claim 1 of the '957 Patent teaches

> [a] method of providing an injectable composition to a patient in
> need thereof, the method comprising administer-ing at least the
> injectable composition to the patient, the injectable composition
> comprising water, 6 μg, 40 μg or 60 μg of selenium, no chromium
> or chromium in an amount not to exceed 1 μg, no aluminum or
> aluminum in an amount not to exceed 6 μg, no iron or iron in an
> amount not to exceed 10 μg, and *fluoride in an amount of 0.0001 μg*
> *to 2.7 μg per 1 mL of the injectable composition.*

'957 Pat. col. 72 l. 61–col. 73 l. 2 (emphasis added). Claims 6 and 9 describe the same method for

the compositions in Claims 8 and 9 of the '565 Patent. *Id.* col. 73 l. 17–18, 24–25.

In advance of oral argument on the Motion, Plaintiff provided the Court with an update on

the ANDA bids of Defendants, indicating that, as of March 27, 2025, only Sun had received final

FDA approval to market its ANDA Product. (ECF No. 152.) In their most recent post-hearing

briefings, the parties agreed that, of the Defendants actively litigating this Motion, Sun remained

the only one with FDA approval. (ECF Nos. 200, 201.)

## C.  Procedural Background

Plaintiff sued each Defendant separately for patent infringement in this Court between

July 16, 2023, and December 13, 2024. On October 22, 2024, pursuant to the parties' stipulation,

the Court consolidated thirteen suits filed by Plaintiff against different defendants (including certain Defendants here) into this action. (ECF No. 27.) Additional Defendants against whom Plaintiff subsequently filed suit also consented to consolidation, which the Court granted on January 3, 2025. (ECF No. 54.) Defendants individually filed Answers and Counterclaims to their respective complaints according to the appropriate deadlines in their individual matters. (ECF Nos. 65, 67, 69, 80.) Plaintiff filed Answers to Defendants' counterclaims on January 28, 2025. (ECF Nos. 104–14.)

On January 17, 2025, Plaintiff filed the Motion for a Preliminary Injunction against all Defendants. (ECF Nos. 85–95.) On February 5, 2025, the Court entered a sealed Order ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████. (ECF No. 122.) Pursuant to the schedule dictated by the Court, Defendants filed a joint opposition brief on February 7, 2025. (ECF Nos. 126, 127.) Plaintiff filed its reply in support of the Motion on February 24, 2025. (ECF No. 131.)

This Court held oral argument on the Motion on March 31, 2025. (ECF No. 163.) Subsequently, the parties submitted supplemental briefing on April 7, 2025. (ECF Nos. 170, 171.) On April 28, 2025, the Court requested additional briefing on the proper bond amount should an injunction issue (ECF No. 190), which the parties filed on May 5, 2025 (ECF Nos. 200, 201).

## II.  LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance

of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994).

In order to obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."); *Ferring*, 765 F.3d at 210. A preliminary injunction also should not be issued where material issues of fact are in dispute. *Vita-Pure, Inc. v. Bhatia*, Civ. A. No. 2:14-7831, 2015 WL 1496396, at * 3 (D.N.J. Apr. 1, 2015) (denying injunction where factual disputes "preclude a determination that Plaintiffs have established a likelihood of success on the merits"); *Watchung Spring Water Co. v. Nestle Waters N. Am. Inc.*, Civ. A. No. 14–04984, 2014 WL 5392065, at *2 (D.N.J. Oct. 23, 2014), *aff'd*, 588 F. App'x 197 (3d Cir. 2014).

### III.   DECISION

Plaintiff asks this Court to enjoin Defendants from selling their respective generic versions of the Selenious Acid Injections "pending the outcome of a trial on the merits" for Plaintiff's infringement claims, arguing the four preliminary injunction factors are met. (ECF No. 95 at 1.) Plaintiff asserts it is likely to succeed in proving the products in Defendants' ANDAs would infringe on multiple valid claims in the '565 and '957 Patents, and it will suffer irreparable harm, through direct competition in violation of its exclusivity rights, if Defendants are not enjoined. (*Id.* at 3–4.) Plaintiff also contends this harm greatly outweighs any harm to Defendants, who have yet to enter the market,[3] and that an injunction favors the public interest in rewarding innovation with patent exclusivity. (*Id.* at 5.) Should the Court grant its request, Plaintiff asserts Defendants should not be entitled to a bond. (*Id.* at 40.)

Defendants request the Court deny Plaintiff's Motion and also vacate the ▮▮▮▮▮▮▮ for several reasons. First, Defendants argue the claims at issue in the '565 and '957 Patents lack an adequate written description of the claimed fluoride range, meaning there is "a substantial question as to their validity." (ECF No. 126 at 1.) Even if valid, Defendants contend Plaintiff fails to establish "a reasonable likelihood of success on infringement." (*Id.*) Defendants also assert Plaintiff's claimed irreparable harms all boil down to lost sales revenue, *i.e.*, money damages, and the public interest favors Defendants. (*Id.* at 1–2.) Alternatively, should the Court grant the Motion and enjoin Defendants, they ask the Court to require Plaintiff to post a bond. (*Id.* at 2.)

---

[3] As of the parties' last briefings, Defendant Sun has received FDA approval to enter the marketplace, though the rest of Defendants' ANDAs are awaiting approval. (ECF Nos. 152 at 2; 170-2 at 88:17–20; 200; 201.)

### A. Likelihood of Success on the Merits

Plaintiff asserts it is likely to succeed on the merits of its infringement claims against Defendants because it is highly likely "Defendants' ANDA Products meet each and every element of . . . Claims 1, 8, and 9" of the '565 Patent (ECF No. 95 at 12) and "will induce infringement of [C]laims 1, 6, and 9" of the '957 Patent (*id.* at 18). Additionally, Plaintiff contends "Defendants cannot raise a substantial question concerning validity of the asserted claims," as it argues they must do to defeat the presumption of validity to which patents are entitled. (*Id.* at 20.) Defendants reject each of these contentions, arguing the claim limitation, "fluoride in an amount of 0.0001 µg to 2.7 µg per 1 mL of the injectable composition," fails to satisfy the written description requirement, meaning it does not provide "reasonable clarity to a person of ordinary skill that the inventors 'possessed' the full scope of the claimed subject matter at the time of filing." (ECF No. 126 at 5.) As an invalid patent cannot be infringed, the Court addresses Plaintiff's likelihood of defeating Defendants' invalidity argument first.

Similar to at trial, on a motion for preliminary injunction, "an issued patent comes with a statutory presumption of validity," and an alleged infringer must "prove invalidity by clear and convincing evidence."[4] *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). However, "when the question of validity arises at the preliminary injunction stage, the application of these burdens and presumptions is tailored to fit the . . . context." *Id.* at 1377. Though the patentee and alleged infringer claiming invalidity face the same evidentiary burdens as at trial,

---

[4] "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are . . . highly probable.'" *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)); *see also IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 903 (Fed. Cir. 2020) (affirming district court properly applied clear and convincing evidence standard in finding patent invalid for indefiniteness).

the presumption of validity operates to place a burden on the alleged infringer to show "the evidence presented in support of invalidity *raises a substantial question*[.]" *Id.* (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992)). Even if the alleged infringer raises this substantial question, the patentee can marshal evidence to show "the invalidity defense 'lacks substantial merit,'" and the court must consider and balance all the evidence before it.[5] *Id.* at 1378. Likewise, the patentee must show "it will likely prove infringement" to obtain a preliminary injunction, *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017) (quoting *Titan Tire*, 566 F.3d at 1376)), and the accused infringer "can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of . . . infringement," *id.* (quoting *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014)).

## 1. Likelihood of Patent Validity

To make the case that the '565 and '957 Patents are invalid, Defendants focus on the fluoride concentration described in Claim 1 of both patents and incorporated into their respective dependent clauses, arguing the claim limitation fails to satisfy the written description requirement. (ECF No. 126 at 5–15.) Defendants assert that the claim language describing "fluoride in an

---

[5] In *Titan Tire*, the Federal Circuit gave trial courts explicit instructions on how to conduct this inquiry:

> [T]he trial court first must weigh the evidence both for and against validity that is available at this preliminary stage in the proceedings. Then, . . . if the trial court concludes there is a "substantial question" concerning the validity of the patent, meaning that the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit, it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue.

566 F.3d at 1379.

amount of 0.0001 µg to 2.7 µg per 1 mL" is absent from the specifications of the patents in suit, meaning there is no evidence to demonstrate to a person of ordinary skill in the art ("POSA")[6] that Plaintiff "possessed injectable compositions containing fluoride in a range of 0.0001 to 2.7 µg/mL." (*Id.* at 7 (citing *Indivior UK Ltd. v. Dr. Reddy's Labs S.A.*, 18 F.4th 1323, 1329 (Fed. Cir. 2021)).) While Defendants note there is a section describing the compositions as including "(i) fluoride from about 0.0001 to about 2.7 µg/kg/day . . . ; or (ii) . . . fluoride from about 0 to about 2.7 µg/kg/day," '565 Pat. col. 17 l. 3–10; '957 Pat. col. 17 l. 8–15, Defendants argue the units used in these passages— µg/kg/day—describe calculations of "the maximum daily amount of fluoride a patient could be administered based on the patient's weight," which are distinct from those in the claims—µg per 1 mL—which denote "the absolute amount of fluoride within an injectable composition based on the composition's total volume" (ECF No. 126 at 8–9). The result, according to Defendants and their expert, Michael Swartz, Ph.D. ("Dr. Swartz"), is that the ranges described in terms of µg/kg/day convert to an upper range of 135 µg/mL to 324 µg/mL, depending on the patient's weight. (*Id.* at 8–10.) Defendants cite cases in which they contend courts "found inadequate written description for claimed ranges that differ from the amounts disclosed in the patents' specification." (*Id.* at 11 (citing *Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc.*, 888 F.3d 1368, 1372–73 (Fed. Cir. 2018); *Indivior*, 18 F.4th at 1328–29; *Eiselstein v. Frank*, 52 F.3d

---

[6] When evaluating construction and validity of patent claims, federal law instructs courts to view the claims from the lens of a POSA. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). In the world of patent law, a POSA is a hypothetical person "presumed to be aware of all the pertinent prior art," but not to possess the unique skills or knowledge of the patent's inventor necessary to arrive at the innovation taught by the patent. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). "A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate[.]" *Id.*

1035, 1040 (Fed. Cir. 1995); *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 457–59 (D. Del. 2021).

Additionally, Defendants argue nothing else in the specification indicates to a POSA that the fluoride concentration is "an aspect of the alleged invention." (*Id.* at 12 (citing *Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000))). Defendants contend that Tables 2 and 4 in the specification of the '565 Patent list other elements to control for within the claimed injectable composition, but they do not include fluoride as an elemental impurity to control, nor does the specification instruct a POSA to test for it. (*Id.* at 12–13.) Because fluoride is added to water and other products in a wide range of concentrations, and the specification "identifies a commercially available injectable composition containing 95 μg/mL of fluoride," Defendants argue a POSA has "no reason to interpret the specification as identifying compositions having fluoride amounts within the [claimed] range." (*Id.* at 14.) Further, Defendants assert a POSA would not have known to consider the trace levels of fluoride absent such instruction "because no validated methods were known at that time to measure fluoride in amounts of 0.0001 to 2.7 μg/mL." (*Id.* at 13.) To support this argument, Defendants point to statements made by Plaintiff's representatives in the prosecution history that Plaintiff developed "specialized tests and instruments . . . to detect and make sure our impurities, if any, were at no detectable levels or very low levels." (*Id.* at 14 (quoting ECF No. 94-6 (Chevalier Decl., Ex. H), Decl. of Richard P. Lawrence Under 37 C.F.R. 1.130(a) and Under 37 C.F.R. § 1.132, Appl. No. 18/124,391, dated Dec. 13, 2023, ¶ 8.)).)

Separately, Defendants claim the written description fails because it does not provide "blaze marks" within the specification "leading to the claimed alleged invention as a whole," meaning a POSA could only discern it "through hindsight," in contravention of Federal Circuit

precedent. (*Id.* at 15 (quoting *In re Ruschig*, 379 F.2d 990, 995 (C.C.P.A. 1967)) (citing *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1326 (Fed. Cir. 2001)).) Defendants compare the specifications of the patents-in-suit to the one rejected by the Federal Circuit in *Novozymes*, in which they assert "the written description independently disclosed each limitation [but] did not connect them or demonstrate that the inventors contemplated combining them within a single embodiment." (*Id.*) Here, Defendants argue "the specification discloses potentially millions of different embodiments" and gives no indication to a POSA of which are contained in the claimed composition. (*Id.* at 16.) Finally, Defendants argue Plaintiff's references to an exchange with the patent examiner in the prosecution history of the '957 Patent that addressed ongoing litigation related to the fluoride limitation in the '565 Patent is inapposite, as it does not refute the sworn testimony of their expert and does not foreclose the possibility the patents-in-suit may yet be invalid. (*Id.* at 17 (citing *In re NTP, Inc.*, 654 F.3d 1268, 1279 (Fed. Cir. 2011)).)

Plaintiff argues its patent claims are "entitled to a presumption of validity, which can sustain a finding of likelihood of success on the merits" for the purposes of a preliminary injunction (ECF No. 95 at 20 (citing *Purdue Pharma*, 237 F.3d at 1365–67; *Abbott Lab'ys v. Sandoz Inc.*, 544 F.3d 1341, 1346 (Fed. Cir. 2008))), and Defendants' lack of written description argument does not raise a substantial question of validity (ECF No. 131 at 8–9). First, Plaintiff refutes Defendants' assertion that the patent examiner did not consider "written description for the fluoride limitation during prosecution of the asserted patents," arguing this description instead "formed an explicit basis for the Examiner allowing the '565 and '957 [P]atents." (*Id.* at 9.) Specifically, Plaintiff points to quotations from the prosecution history of the '565 Patent where the examiner "agreed

that amending the claims to recite fluoride in an amount of '0.0001 mcg[7] to 2.7 mcg [] per 1 mL' would place the claims in condition for patentability" and explicitly noted no prior art taught a composition "comprising selenium and fluoride in" the specified range. (*Id.* (quoting ECF No. 94-6 at 13, 31; ECF No. 94-7 at 13).) Referring to passages from the Manual for Patent Examining Procedure ("MPEP"), Plaintiff argues this exchange demonstrates the patent examiner '"ma[d]e certain' that limitation had 'adequate descriptive support' in the specification" and, in itself, is evidence of an adequate description. (*Id.* (quoting MPEP § 1302.01) (citing *Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1366 (Fed. Cir. 2004); *Ortho McNeil Pharm., Inc. v. Barr Lab'ys, Inc.*, Civ. A. No. 03-4678, 2009 WL 2182665, at *2 (D.N.J. July 22, 2009)).)

Second, Plaintiff asserts Defendants' reading of the relevant passages of the specifications does not reflect the background and experience of a POSA.[8] (*Id.* at 10.) In Plaintiff's view, the specifications list two criteria for the claimed injectable compositions: "optimal concentrations of certain trace elements, such as selenium, necessary for specific metabolic functions;" and "little to no other trace elements present as impurities or contaminants." (*Id.* (internal quotation marks omitted).) Plaintiff also asserts the specification explains the inventors purposefully prepared the compositions "with lower, and thus 'safer,' amounts of impurities," so the patented compositions

---

[7] The Court notes that "mcg" and "μg" are both accepted abbreviations of the unit "microgram," or one millionth of a gram. *See Metric System*, Merriam-Webster (accessed Mar. 17, 2025), https://www.merriam-webster.com/dictionary/metric%20system#table.

[8] Plaintiff's experts assert that a POSA for the '565 and '957 Patents would need some combination of relevant degrees and certifications and two to five years of experience in "injectable trace-element compositions and/or development, design or manufacture thereof and/or providing injectable trace-element compositions to patients, or related discipline, or alternatively, a person with commensurate experience in the relevant field." (ECF No. 151-5, Ex. D, ¶ 10; ECF No. 131-10, Ex. E, ¶ 7.) Plaintiff asserts Defendants do not provide a competing POSA definition, and that Dr. Swartz does not appear to have the qualifications their definition requires, as he did not mention experience with "injectable trace element[s]." (ECF No. 131 at 10 n.2.)

could be used for both "very low-weight neonates" as well as adults and higher-weight pediatric patients. (*Id.* at 10–11.) Plaintiff therefore contends the specification reference to "fluoride from about 0.0001 to about 2.7 mcg/kg/day" would be read by a POSA as directed toward safety "for even the lowest-weight neonates" and the claims included "0.0001 to 2.7 µg/mL" of fluoride as a limitation to reflect the goal of making a product administrable to even a neonate weighing 1 kilogram. (*Id.* at 11.) As a result, Plaintiff argues a POSA "reviewing the disclosures in the specification would [recognize] the specific amounts of fluoride recited in the claims," therefore satisfying the written description requirement. (*Id.* at 12 (citing *BioDelivery Scis. Int'l, Inc. v. Alvogen PB Rsch. & Dev. LLC*, 576 F. Supp. 3d 184, 211 (D. Del. 2021), *aff'd in relevant part sub nom. Arius Two, Inc. v. Alvogen PB Rsch. & Dev. LLC*, No. 2022-1394, 2022 WL 17828352 (Fed. Cir. Dec. 21, 2022); *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370 (Fed. Cir. 2022)).) And Plaintiff rejects the relevancy of the "thought experiment" Defendants' expert performed in which he extrapolated greater ranges of fluoride concentration based on the specification's mcg/kg/day values because "a POSA would start with the understanding that the inventors were focused on developing compositions with safer—i.e., 'little to no'—amounts of impurities like fluoride usable for both lower-weight neonatal patients dosed based on weight and older children and adults not dosed on weight." (*Id.* at 12.) Given that context, Plaintiff contends a POSA "would *not* somehow believe the specification described adding many orders of magnitude *more* fluoride to the composition for the higher-weight patients based on their weight" and would instead understand the inventors to possess "an injectable composition with very little fluoride, including the recited . . . range, for very small babies" but that was stable and could be used and customized for adults. (*Id.* at 12–13.)

Finally, Plaintiff contests both Defendants' assertions that there were no industry-accepted standards for measuring fluoride at the specified range and that the patents-in-suit lack sufficient "blaze marks" for a POSA to discern the claimed invention. (*Id.* at 13–14.) Plaintiff contends "multiple tests for measuring impurities [are] expressly described in the specification . . . as used to measure impurities in compositions containing selenium like the one claimed," and a POSA would be familiar with how to use the tests to measure these small concentrations of fluoride. (*Id.* at 14.) Regarding the need for "blaze marks," Plaintiff points to the language of its originally filed claims, "recit[ing] a *single* injectable composition" containing selenium and fluoride in the amounts claimed, and cites Federal Circuit law indicating that "[o]riginal claims are part of the specification and in many cases will satisfy the written description requirement." (*Id.* at 14 (quoting *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011)) (citing *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1297 (Fed. Cir. 2017)).) Moreover, Plaintiff argues a POSA with the appropriate knowledge of trace element injectables would understand the specification to disclose "a limited number of compositions," rather than the "untold number" Defendants contend. (*Id.* at 14–15.)

At oral argument and in its post-hearing brief, Plaintiff reasserted that the originally filed claims of the patents-in-suit contained the fluoride limitation language, and original claim language satisfies the written description requirement, as they are part of the specification. (ECF Nos. 170 at 1 (citing *Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, 111 F.4th 1358, 1374 (Fed. Cir. 2024)); 170-2 (Apr. 7, 2025 Hr'g Trans.) at 18:21–21:21.) Plaintiff points to original claims ("OCs") 1 and 4, as filed July 2, 2020, where OC 1 described "an injectable composition" containing selenium in "μg . . . per 1 mL of the injectable composition," and OC 4 depended on OC 1 and "further compris[ed] . . . fluoride from about 0.0001 to about 2.7[.]" (ECF No. 170 at 1

(citing ECF 94-6 at 292).) Through these OCs, Plaintiff contends a POSA would understand the inventors to describe "(i) an injectable composition, (ii) fluoride, (iii) in the specific claimed numerical range 0.0001 to 2.7, and (iii) components in terms of per 1 mL of the injectable composition." (*Id.*) While the other trace elements described in OC 4 are given units of measurement of "mcg/kg/day," Plaintiff argues a POSA would "readily understand that 'µg' is the proper unit of measure for fluoride in the original claims," based on the surrounding context. (*Id.* at 1–2.) Because OC 1 describes a composition of 1 mL, Plaintiff contends a POSA would logically conclude the claims describe fluoride in units of "µg per 1 mL." (*Id.* at 2–3.) Responding to Defendants' criticism that the only passage in the specification itself describing the claimed fluoride range also uses "mcg/kg/day," Plaintiff argues this passage describes another, unclaimed aspect of the invention, a calculation for daily dosing amounts of trace elements, that "do[es] not detract from the clear written description provided by the original claims' disclosure" for a product composition. (*Id.* at 3–4 (citing *Abbott Lab'ys v. Brennan*, 952 F.2d 1346, 1355 (Fed. Cir. 1991); *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016).) For the same reason, Plaintiff characterizes Dr. Swartz's dosing calculations based on this passage as having no bearing on whether the OCs provide adequate written description, as the former describes a dosage regimen while the latter describes a product composition. (*Id.* at 4–5.)

In response, Defendants argue OC 4 does not accomplish what Plaintiff claims because it is "silent on the parties' critical dispute—the units for the fluoride element." (ECF No. 171 at 3.) Instead, Defendants highlight parts of Dr. Swartz's declaration where he considered OC 4 and determined it did not describe the claimed fluoride range because the units of measurement for fluoride were missing. (*Id.* at 4.) Defendants also further refute Plaintiff's argument (made during the hearing) that Dr. Swartz is not a POSA for the patents-in-suit. (ECF No. 170-2 at 18:17–20.)

19

Defendants assert Dr. Swartz declared under oath he was a POSA after reviewing Plaintiff's proposed POSA definition, and this sworn statement is supported by his background and experiences, including with "trace elemental analysis." (*Id.* at 35:6–36:3; ECF No. 171 at 1–2.) Finally, Defendants contend there is only "weak" support for Plaintiff's view that other aspects of the specification would imply a fluoride limitation to a POSA and contravenes 35 U.S.C. § 112's requirement of "clear, concise, and exact terms" in the written description.

### a.  Analysis

Under 35 U.S.C. § 112(a), a patent's specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same[.]"  As the Federal Circuit has taught, "the test for sufficiency" of a written description "is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms.*, 598 F.3d at 1351. When determining if the inventor had "possession" based on the written description, the Federal Circuit has clarified that "the hallmark of written description is disclosure," and therefore "the specification must describe an invention understandable to [a POSA]," thereby showing the inventor did in fact invent it. *Id.* Because this inquiry is a "question of fact[,] . . . the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

Despite the Federal Circuit's emphasis on disclosure, however, a written description "need not recite the claimed invention *in haec verba*" or "ignore the perspective of the person of ordinary skill in the art and require literal description of every limitation," so long as a POSA could recognize the claimed invention from the disclosure. *Novartis Pharms. Corp. v. Accord*

*Healthcare, Inc.*, 21 F.4th 1362 (Fed. Cir. 2022) ("*Novartis I*") (quoting *Ariad*, 598 F.3d at 1352), *vacated on other grounds*, 38 F.4th 1013 (Fed. Cir. 2022). In assessing what a POSA would understand the specification to disclose, a court may be guided by expert testimony, but the inquiry must begin within "the four corners of the specification." *Allergan USA*, 111 F.4th at 1375–76 (reversing district court's bench trial determination that patent satisfied written description requirement where "specification as a whole show[ed] possession through its description of a formulation" without key aspect in patent claim because expert testimony indicating contrary could not "fill that gap"); *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1018 (Fed. Cir. 2022) ("*Novartis II*") ("[E]xpert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight." (quoting *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) (alteration in original))). The Federal Circuit has also made clear that "[o]riginally filed claims [are] part of the specification to be considered in any § 112 analysis." *Allergan USA*, 111 F.4th at 1374 (noting inventors "did have [possession of patented formulation] as they disclosed it in an original claim, whether that claim remained or not"). Nonetheless, the specification must provide a POSA with sufficient "blaze marks" to guide them to the subject of the claim; a claim whose origins within the specification can only be identified "by hindsight" does not satisfy the written description requirement. *Novozymes*, 723 F.3d 1346–49 (quoting *In re Ruschig*, 379 F.2d at 994–95).

When it comes to claim limitations involving a numerical range, the Federal Circuit has specifically stated "a skilled artisan must be able to reasonably discern a disclosure of that range" to satisfy the written description requirement. *Indivior*, 18 F.4th at 1328 (finding patent did not satisfy written description requirement where specification and application did not include range of polymer stated in claims, in some places stated any polymer value was acceptable, and did not

indicate an upper limit on amount of polymer); *see also Rai Strategic Holdings, Inc. v. Philip Morris Prods. S.A.*, 92 F.4th 1085, 1090–91 (Fed. Cir. 2024) (finding "no reasonable fact finder could find that the claimed subrange [about 75% to about 85%] is not within the appellant's invention" because other ranges in specification disclosed endpoints of claimed range, "there is no evidence that the claimed subrange results in a different invention than the invention disclosed in the specification," and specification contained "no inconsistent statements regarding the range"). However, "[t]here is no requirement, in the context of claim limitations that recite ranges, that the specification provide any examples at all, much less examples for all embodiments throughout the range." *In re Aflibercept Pat. Litig.*, Civ. A. No. 1:23-97, 2024 WL 3423047, at *14 (N.D.W. Va. July 9, 2024), *aff'd sub nom. Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896 (Fed. Cir. 2025). The Federal Circuit has found a claimed range's written description to be "adequate" where the bound of a claim limitation "'would be limited by what a person skilled in the art would understand to be workable' and where the patent's specification adequately supported that range." *Regeneron*, 127 F.4th at 917 (quoting *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1576 (Fed. Cir. 1985)) (affirming district court's determination preliminary injunction was warranted because written description was likely adequate, as claim range of "at least 98%" would be understood by POSA to encompass 100% and testing examples included results around 99%).

Considering this background and the parties' arguments, the Court finds Defendants have not raised a substantial question as to the validity of the patents-in-suit, meaning Plaintiff is likely to prevail on the merits. *See Titan Tire*, 566 F.3d at 1377. On the face of the patents-in-suit, the range that appears in the claim language, "0.0001 to 2.7 μg/mL," appears in the specification, albeit in a different, related unit of measurement, "fluoride from about 0.0001 to about 2.7 mcg/kg/day." '565 Pat. col. 17 l. 3–10; '957 Pat. col. 17 l. 8–15. The Federal Circuit and district courts have

found patent claims to be supported by written description when both ends of a claimed range in a limitation are listed in the specification, and the language of the specification does not point to a different invention. *See Rai Strategic Holdings*, 92 F.4th at 1090–91; *Waddington N. Am., Inc. v. Sabert Corp.*, Civ. A. No. 09-4883, 2011 WL 1098996, at *5–6 (D.N.J. Mar. 22, 2011) (finding sufficient written description for claimed thickness range of "less than about 2000 nanometers" where specification and application indicated invention goal was to have thin coating, and provisional application described process as capable of producing thicknesses from "a few nanometers to thousands of nanometers"); *BioDelivery Scis.*, 576 F. Supp. 3d at 211 (finding parent patent application stating "the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5 and any incremental value thereof" provided written disclosure of range of claimed pH values—"about 4–6, about 4.5–5.5, and about 4.5–5"—where expert testimony indicated POSA would understand "device" to apply only to one aspect of invention); *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1137 (Fed. Cir. 2018) (affirming patent met written description requirement for dose of "12 mg/day or less" where specification described adjusting dosages for different types of patients to "75% or less, 50% or less, or 25% or less of the dose typically administered" and provided example of 24 mg/day dose). Here, as Plaintiff notes and Defendants concede, the patents-in-suit describe dosing information for fluoride, of which the claimed range is a subset embodied in Plaintiff's composition. *See Vanda Pharms.*, 887 F.3d at 1137 (finding specification's discussion of dosing implications from drug testing results with multiple examples beyond the claimed range "d[id] not compel a finding that the asserted claims lack adequate written description"); *Scriptpro*, 762 F.3d at 1359 ("It is common, and often permissible, for particular claims to pick out a subset of the full range of described features, omitting others.").

In contrast, Defendants rely on cases that invalidated claimed ranges where the specification at issue did not recite any range, *see Purdue Pharms.*, 230 F.3d at 1324 (affirming finding that claim language describing "ratio of more than two" for concentration over was not adequately described by specification passage referring to "flat" concentration curve, without mentioning numerical values, and examples showed ratios both above and below two); the range in the specification was open-ended, but the claimed range was not, *see Indivior*, 18 F.4th at 1328–29 (finding written description requirement not met because, among other reasons, specification did not disclose upper limit described in claims); or the specification and claims recited distinct or only partially overlapping ranges, *see Eiselstein*, 52 F.3 at 1039–40 (affirming determination that application specification reciting "[a]n alloy containing about . . . nickel in a weight proportion of 45% to 55%" adequately described claim of "nickel being from about 45% to about 55% of said alloy," but rejecting claim relying on same language to support range of 50% to 60% nickel); *Novozymes*, 723 F.3d at 1348–49 (finding written description insufficient because, among other reasons, specification discussed enzyme that "share[d] only 65.4% sequence identity with BSG alpha-amylase—i.e., less than the 90% identity required by the claims").

Additionally, the patents-in-suits' prosecution history shows the patent examiner specifically considered the fluoride limitation and recommended its inclusion to create conditions of patentability, "showing that the [Patent and Trademark Office ("PTO")] read the specification to include that feature." *Metabolite Lab'ys*, 370 F.3d at 1366. OCs 1 and 4 confirm this was the examiner's understanding, as they disclose an injectable composition with components measured in µg per 1 mL and associate the range of 0.0001 to 2.7 with fluoride. (ECF No. 94-6 at 292.) In allowing the '565 and '957 Patents to issue, the examiner specifically stated "the prior art lacks a

teaching or suggestion of a composition comprising selenium and fluoride in an amount of 0.0001–2.7 μg," combining elements present across OCs 1 and 4. (*Id.* at 13.)

Defendants argue the "0.0001 to about 2.7 mcg/kg/day" language in the specification does not adequately disclose the end points of the claimed range because, according to Dr. Swartz, the use of "mcg/kg/day" rather than "μg/mL" would indicate a significantly larger range of concentrations than "0.0001 to 2.7 μg/mL" to a POSA. There are two issues with this argument. First, it relies on Dr. Swartz's extrapolation, outside the intrinsic evidence of the patents-in-suit, as to what a POSA might understand. But as Plaintiff highlights, Defendants do not provide their understanding of who would be a POSA for the '565 and '957 Patents and rely on Plaintiff's definition. (ECF No. 171 at 1–2.) While Defendants' expert, Dr. Swartz, opines as to what a POSA would understand from the patents-in-suit, he does not appear to have significant experience with injectable trace element compositions. In his declaration, Dr. Swartz briefly mentions his "test development and validation work supported . . . trace elemental analysis as well as impurity analysis" (ECF No. 127 ¶ 4), but it is not clear from his resume he has the years of experience with injectable trace element compositions the definition of a POSA expects (ECF No. 131-5 ¶ 10).

Second, and more importantly, Defendants' reading divorces the reference to "fluoride from about 0.0001 to about 2.7 mcg/kg/day" from the specification's language about reducing impurities and improving safety, in particular for neonatal patients.[9] *See* '565 Pat. col. 2 l. 57–62

---

[9] There is also evidence in the specification that Plaintiff's compositions were crafted with an understanding of the calculated maximum concentration per day of various impurities. Table 4 of the patents-in-suit lists various elemental impurities, their permitted daily exposure ("PDE") limits for pediatric patients, expressed in "μg/day," and the concentration (expressed in μg/mL) in the "American Regent Specification." '565 Pat. Table 4; '957 Pat. Table 4. For every element, the "American Regent Specification" concentration is at or beneath the PDE for a pediatric patient. *See id.* Plaintiff's expert, Dr. James V. Cizdziel, supports this understanding, stating that, because the specification "expressly provides methods to create a composition" of selenious acid in single

("There is also provided a trace element composition and method that have lower daily doses of one or more trace element . . . that can be dosed for adult, pediatric, or neonatal patients."); *id.* col. 14 l. 64–67 ("Dosing recommendations for pediatric patients is based on body weight and ranges from about 0.2 mL to about 0.8 mL per day[.]"); *id.* col. 21 l. 31–51 ("Parenteral nutrition has become an integral part of the support of the neonate who is either unable to receive or tolerate enteral feeding[, including those with] extremely low birth weight [(]less than 1000 g). . . . We have, therefore, prepared a stable parenteral nutrition that can be used in a wide spectrum of patients, adult, pediatric and neonate.") The Federal Circuit has explained that a specification may contain an adequate written description where a POSA would understand a limiting upper bound was necessary for the invention "to be workable and where the patent's specification adequately supported that range."[10] *Regeneron Pharms.*, 127 F.4th at 916 (internal quotations omitted). In determining what would be workable to a POSA, courts have also considered other motivations for the invention expressed within the specification that inform reading the rest of the specification, and the specifications in the patents-in-suit appear to guide a POSA to an understanding that the

---

dose vials, "a POSA would understand that concentrations of trace elements can be expressed in terms of the amount per 1 mL of the composition or in terms of the amount the injectable composition includes per day of a given element" and that "where a trace element amount within the disclosed injectable compositions is expressed in terms of µg/kg/day, it interchangeably could be expressed in terms of µg/kg/mL when used in the disclosed once-daily '1 mL single dose vial.'" (ECF No. 131-5 (Reply Decl. of James V. Cizdziel) ¶¶ 48–50.)

[10] For the same reason, Defendants' argument the specification lacks sufficient "blaze marks" does not present a substantial question of validity. *See Novartis I*, 21 F.4th at 1370 ("'Blaze marks' are not necessary where the claimed species is expressly described in the specification."); *Waddington N. Am.*, 2011 WL 1098996 at *6 (distinguishing patent-in-suit from facts of *Purdue Pharma*, where "[t]he Federal Circuit concluded that the specification disclosed 'a multitude of pharmacokinetic parameters, with no blaze marks directing the skilled artisan,'" because specification in patent-in-suit emphasized priority of thinness and described a range entirely inclusive of claimed range, and noting no binding authority exists that "claiming a narrower range than that disclosed in the specification makes a claim invalid for lack of written description").

inventors sought to control for all possible impurities, including fluoride. *See, e.g.*, *Waddington N. Am.*, 2011 WL 1098996 at *5 (using understanding from provisional application that "thinner is better" in the context of invention to find language about thickness ranges in specification supported claimed thickness range); *Vanda Pharms.*, 887 F.3d at 1137 (citing section of specification that describes how "patients can be more safely treated" using dosing process in which claimed range was an example as part of adequate written description). Conversely, Defendants' reading contradicts "the four corners of the specification," contrary to the Federal Circuit's guidance. *Allergan*, 111 F.4th at 1375–76.

Additionally, Plaintiffs' experts present evidence grounded in the specification that a POSA would understand the inventors' decision "to include 'little or no impurities' in their injectable compositions" and therefore that the inventors possessed a selenium injectable composition with "little or no impurities," including from fluoride. (ECF No. 131-10 (Reply Decl. of Theresa A. Fessler) ¶ 24; *see also* ECF No. 131-5 ¶¶ 59–63.)

Because, as described *supra*, Defendants fail to raise a "substantial question" regarding the validity of the '565 and '957 Patents, the Court finds Plaintiff is likely to succeed in defeating Defendants' invalidity contentions. *Titan Tire*, 566 F.3d at 1377.

### 2.  Likelihood of Infringement

Plaintiff argues it is likely to succeed in proving Defendants' ANDA Products will infringe "at least claims 1, 8, and 9 of the '565 [P]atent" and "will induce infringement of claims 1, 6, and 9 of the '957 [P]atent." (ECF No. 95 at 12, 18.)

27

Regarding the '565 Patent claims, Plaintiff points to language in Defendants' ANDAs[11] indicating ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████ ███ ██ ██████ Plaintiff also highlights that many of Defendants' ANDAs recite ██████████████████████████████████
████████████████████ For those ANDAs that do not, Plaintiff argues that, "given the similarities between each Defendants' and [Plaintiff]'s products and processes, it is highly likely that these remaining products will contain the recited low or no amounts of chromium" and/or iron, based on Dr. Cizdziel's expert declaration. (*Id.*) Additionally, Plaintiff asserts ████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████ Plaintiff contends Defendants
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[11] Plaintiff also notes that several Defendants "make *no* attempt to assert non-infringement of these claims" in their paragraph IV notice letters. (ECF No. 95 at 13.)

[12] As discussed *supra*, Claim 1 of the '565 Patent claims

> [a]n injectable composition comprising water, 6 µg or 60 µg of selenium, no chromium or chromium in an amount not to exceed 1 µg, no aluminum or aluminum in an amount not to exceed 6 µg, no iron or iron in an amount up to 10 µg, and fluoride in an amount of 0.0001 µg to 2.7 µg per 1 mL of the injectable composition.

'565 Pat. col. 71 l. 36–41. '565 Patent Claims 8 and 9 depend on Claim 1, describing a composition of Claim 1 that has "a pH of 1.8 to 2.4" and one that "further comprises nitric acid," respectively. '565 Pat. col. 71 l. 60–63.



Finally, Plaintiff argues that, by virtue of the fact Defendants' ANDA Products are intended as "generic version[s] of [Plaintiff's] Selenious Acid product, . . .

(*Id.* at 15–16.)

In addition, Plaintiff argues Defendants should not be rewarded for their failure to produce "samples or *any* discovery outside their ANDAs" prior to this Motion.[13] (*Id.* at 17–18.) Plaintiff asserts Defendants "should not be allowed to rely on newly produced information or things to defend against an injunction." (*Id.* at 18.) In support, it cites case law it contends demonstrates "samples are indisputably relevant [and discoverable] in patent infringement cases," including in Hatch-Waxman cases where the ANDA specification "[does] not resolve the question of infringement in the first instance." (*Id.* at 17 (quoting *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1279–80 (Fed. Cir. 2013) (alteration in original)).)

Plaintiff also claims "[t]he proposed labeling for Defendants' ANDA products" is likely to induce infringement of the '957 Patent claims at issue. (*Id.*) Describing the elements of induced infringement in the Hatch-Waxman context as requiring "(a) there would be direct infringement if the ANDA product was marketed; and (b) the label for the ANDA product 'encourage[s],

---

[13] In its reply briefing, Plaintiff notes it received Sun's samples of its ANDA Product after filing the Motion. (ECF No. 131 at 3.)

recommend[s], or promote[s] infringement,'" Plaintiff asserts Defendants' proposed labeling "instructs [medical] practitioners to perform the claimed methods" of claims 1, 6, and 9, thus encouraging infringement. (*Id.* (quoting *Vanda Pharms.*, 887 F.3d at 1129–30).) Since "Defendants' products prescribing information (i.e., 'labels') . . . are materially identical to [Plaintiff]'s label," Plaintiff contends the labels will induce infringement because (1) "Defendants' ANDA Products will highly likely meet the injectable composition limitations of claims 1, 6, and 9 of the '957 [P]atent" (having asserted they fit the elements of claims 1, 8, and 9 in the '565 Patent); and (2) the labels "will instruct caregivers to administer Defendants' ANDA products to a patient in need" in order to obtain "the recommended selenium dose per day." (*Id.* at 19.)

In their opposition, Defendants argue Plaintiff's infringement theory "relies on misplaced speculations and assumptions" that cannot meet its burden of establishing it is likely to succeed on the merits of its infringement claims, particularly because it relies on the assumption "that fluoride is present in high levels in ground water and that Defendants' water purification techniques are inadequate to remove fluoride below the claimed range." (ECF No. 126 at 17–18.) Defendants contend this is a problem because Plaintiff does not present "any direct evidence" of the required fluoride concentration in their ANDA Products, as required by Federal Circuit precedent, as it has not tested "Defendants' source water, their water purification techniques, or Defendants' ANDA [P]roducts" and acknowledges ████████████████████████████████████ ████████████████████████████ (*Id.* at 18 (citing *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1253 (Fed. Cir. 2010)).)

Defendants criticize Dr. Cizdziel's report, which assumes the water Defendants use comes from India or another country with levels of fluoride around "2.37 mg/L," equivalent to 2.37 μg/mL, because the source on which Dr. Cizdziel relies, the "Ali 2019 Article" (ECF No. 88-3),

also reports fluoride levels in India vary widely (ECF No. 126 at 19). As a result, Defendants contend this source only indicates the ANDA Products "*might* meet the claim limitation," which they argue is too speculative to meet Plaintiff's burden of proof on infringement. (*Id.* at 20 (cleaned up) (quoting *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003–04 (Fed. Cir. 2019)).) Defendants also point to "[m]ore recent data from the same author" (the "Ali 2023 Article"), which they argue shows "nearly every region" in India "includes groundwater with a fluoride concentration less than 1.5 mg/L." (*Id.* at 20.) They also assert the Ali 2023 Article shows "14 out of 19 reported states [in India] have fluoride concentrations that range as low as about 0.1 mg/L." (*Id.* at 21.) ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████, Defendants assert the Ali 2023 Article's findings "are fatal to [Plaintiff's] infringement theory." (*Id.*)

Additionally, Defendants argue Plaintiff did not adequately demonstrate their water purification processes will not remove fluoride from the source water because Plaintiff did not test their purification methods. (*Id.* at 21.) Defendants contend Plaintiff speculates about the efficacy of the purification processes based on processes for treating drinking water (which Defendants contend involves processes distinct from "producing water for injection") and assumes the efficacy of fluoride removal based on "disparate sources." (*Id.* at 22.) Defendants also critique Plaintiff's assumption that other components of the ANDA products likely introduce additional fluoride during the manufacturing process, as they contend this is based only on references to "impurities" in Plaintiff's own manufacturing. (*Id.* at 22–23.) As a result, Defendants argue Plaintiff presents only data "correlating to the claimed limitation" that does not sufficiently demonstrate literal

infringement. (*Id.* at 22 (quoting *Brigham & Women's Hosp.*, 761 F. App'x at 1003).) And Defendants dispute Plaintiff's version of the discovery history between the sides as to why it has not tested samples of the ANDA Products. (*Id.* at 23.) Defendants assert Plaintiff served "excessive" discovery requests for samples[14] from each Defendant on October 28, 2024, to which Defendants replied and objected a month later, requesting a meet and confer with Plaintiff over the number of samples. (*Id.*) Defendants contend Plaintiff never requested this meet and confer or "otherwise pursued samples from Defendants," placing blame for the lack of sample testing on Plaintiff. (*Id.*) But assuming, *arguendo*, Plaintiff had samples of the ANDA Products, Defendants assert it could not test for infringement because there is no test "sensitive enough to distinguish between zero and .0001 μg/mL of fluoride." (*Id.* at 23–24.) In their post-hearing brief, Defendants also highlight that Plaintiff has had samples from Sun since January 29, 2025, but has not provided testing results for Sun's product here or with its infringement contentions (filed March 18, 2025). (ECF No. 171 at 8.) Defendants argue Plaintiff's failure to provide the Court with data on Sun's ANDA Product when it conceivably has direct evidence on the presence or absence of the fluoride element for that Defendant should raise suspicion that Plaintiff will not succeed on the merits. (*Id.*)

In reply, Plaintiff disputes it must provide "direct evidence," rather than circumstantial evidence, to show likelihood of success on the merits at the preliminary injunction stage. (ECF No. 131 at 2 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009)).) Instead, Plaintiff asserts Defendants are trying to characterize Plaintiff's evidence as insufficient, despite meeting its infringement burden at this

---

[14] Defendants state Plaintiff requested "[o]ne hundred (100) vials from each exhibit batch of Defendant's ANDA Product." (ECF No. 126 at 23 (alteration in original).)

stage, because "Defendants failed to provide *any* rebuttal expert testimony on the issue of infringement." (*Id.* at 3.) Plaintiff also characterizes Defendants' arguments about testing as a distraction, as Plaintiff contends it "repeatedly attempted to obtain samples of Defendants' ANDA Products, as well as other discovery relating to fluoride," but did not receive any samples until twelve days after its opening Motion papers, when it received Sun's sample. (*Id.*) As a result, Plaintiff was unable to test any samples before filing the Motion.[15] Additionally, Plaintiff argues Defendants' request for a meet and confer was a "delay tactic," as Defendants have yet to explain why the number of samples it requested was excessive or offer an alternative number of samples.[16] (*Id.*) Plaintiff therefore argues Defendants "should not profit" from failing to produce this discovery, and the Court can make an adverse inference "Defendants' purposeful and repeated delay in production of their product samples" indicates they "contain[] evidence *supporting* [Plaintiff's] assertions regarding fluoride." (*Id.* at 4 (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004); *Vasquez v. MobileShack Inc.*, Civ. A. No. 19-10371, 2022 WL 807602, at *3 (S.D.N.Y. Mar. 17, 2022)).)

As to the merits of Defendants' arguments against infringement of the fluoride limitation, Plaintiff asserts Defendants' critiques of Dr. Cizdziel's methodology are "unsupported attorney argument" that cannot alone overcome the expert evidence Dr. Cizdziel provides. (*Id.* at 4–5 (citing *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *CryoLife, Inc. v. C.R. Bard, Inc.*, No. CV 14-559-SLR, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015); *Natera,*

---

[15] In its post-hearing brief, Plaintiff reiterates this point and asserts "Defendants cannot now legitimately use [the receipt of Sun's samples] as an excuse to escape a preliminary injunction," again noting Defendants would have incentive to produce samples or conduct their own testing if they believed the results to be exculpatory on the issue of infringement. (ECF No. 170 at 9.)

[16] Plaintiff also argues, for the first time, that certain Defendants violated Local Patent Rule 3.6(j) "by not timely producing FDA correspondence within seven days." (ECF No. 131 at 3–4.)

*Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1377 (Fed. Cir. 2024)).) Among other things, Plaintiff contends Defendants' review of Dr. Cizdziel's work is flawed because they (1) "gross[ly] oversimpl[fy]" his logic on why the ANDA Products are likely to contain fluoride in the claimed range; (2) discount other sources Dr. Cizdziel relied on to show "fluoride in the groundwater in *many* locations," including India, besides the Ali 2019 Article; (3) "cherry-pick" numbers from the Ali 2023 Article of the lowest levels of fluoride, "single datapoints out of hundreds tested," which still fall within the claimed range and which would not be removed by Defendants' purification processes; and (4) ignore the scientific literature supporting the values Dr. Cizdziel ascribed to Defendants' water purification processes and his resulting conclusion. (*Id.* at 5–7.) Additionally, Plaintiff argues the fact that the FDA requested one generic manufacturer ████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Finally, in response to Defendants' argument that Plaintiff provides no means of testing for fluoride outside the low end of the claimed range, Plaintiff argues it is not required to show the ANDA Products *do not* infringe, but "need only show Defendants have fluoride *within* the recited range of 0.0001 and 2.7 mcg/mL," which Plaintiff is capable of doing because it tests its own products to confirm they are within that range. (*Id.* at 8.) Moreover, Plaintiff points to Dr. Cizdziel's expert testimony on "routine ways to concentrate samples" and thereby test for the lower bound of the recited range, which Plaintiff also contends Defendants fail to rebut with expert testimony of their own. (*Id.* (citing *Edge Sys. LLC v. Aguila*, 708 F. App'x 998, 1005 (Fed. Cir. 2017)).)

---

[17] The Court granted Plaintiff and Zydus Pharmaceuticals (USA) Inc.'s request for a consent judgment on May 22, 2025. (ECF No. 215.)

"An infringement analysis involves the two-step process of 'construing the claims and comparing the properly construed claims to the accused product.'" *Tinnus Enters.*, 846 F.3d at 1203 (quoting *Advanced Steel Recovery, LLC v. X–Body Equip., Inc.*, 808 F.3d 1313, 1316 (Fed. Cir. 2015); *see also Sebela Int'l Ltd. v. Actavis Lab'ys FL, Inc.*, Civ. A. No. 17-4789, 2017 WL 4782807, at *2 (D.N.J. Oct. 20, 2017) ("When assessing the likelihood of success of a patent infringement claim, the Court engages in the same two-step process used in considering infringement later in the litigation, by first determining the scope and meaning of the asserted patent claims and then comparing the construed claims to the allegedly infringing product.") (citing *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003)).

As neither party raises an issue of construction in this Motion,[18] the Court will move directly to comparing the claims at issue in the '565 and '957 Patents to the ANDA Products.

The parties contest what type of evidence a patentee needs to present on a motion for preliminary injunction, and whether circumstantial evidence will suffice to show Plaintiff is likely to succeed on the merits of its infringement claims. "A patentee is entitled to rely on circumstantial evidence to establish infringement: . . . It is hornbook law that direct evidence of a fact is not necessary." *Tinnus Enters.*, 846 F.3d at 1204 (internal quotations omitted) (affirming district court's finding patentee was likely to succeed on merits of infringement claim based on circumstantial evidence in instruction manual of defendant's product); *accord VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1318 (Fed. Cir. 2014) (evaluating circumstantial evidence that competition between parties created undue prejudice in reversing district court's denial of stay pending post-grant review of patent and acknowledging "direct evidence of such competition is

---

[18] The Court notes the parties have filed a joint claim construction statement, and Plaintiff has filed its opening claim construction brief. (ECF Nos. 169, 187.)

not required . . . especially at such an early stage of the proceedings"). Indeed, circumstantial evidence is admissible to demonstrate infringement at all stages of litigation. *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 449 F. App'x 923, 928 (Fed. Cir. 2011) ("A patentee may prove infringement by direct or circumstantial evidence; a patentee is not required to present direct evidence of infringement." (internal citations omitted)) (affirming district court judge's determination, following bench trial, that circumstantial evidence allowed findings of fact that "were sufficiently comprehensive and pertinent to the issue of direct infringement"); *Agri-Labs Holding LLC v. Taplogic, LLC*, 304 F. Supp. 3d 773, 793 (N.D. Ind. 2018) (relying on circumstantial evidence to deny summary judgment on issue of non-infringement). Therefore, the Court will evaluate all Plaintiff's presented evidence, including circumstantial evidence presented through its expert declaration, to determine if Plaintiff is likely to prove literal and induced infringement at trial.

### a.  Literal Infringement of '565 Patent

"Literal [or direct] infringement requires that 'every limitation set forth in a claim must be found in an accused product, exactly.'" *Advanced Transit Dynamics, Inc. v. Ridge Corp.*, Civ. A. No. 15-1877, 2015 WL 12516692, at *2 (C.D. Cal. Aug. 24, 2015) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995)) (granting preliminary injunction based on reasonable likelihood of success on patent infringement claims). Defendants attempt to raise a substantial question about one element of the patents-in-suit, whether the ANDA Products satisfy the fluoride limitation, and the Court will therefore conclude Plaintiff is likely to prove the other elements of the claims at issue are met. *See id.* at *4 (accepting defendant's non-contestation elements of patent were present as satisfying requirement for preliminary injunction); *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017) (same).

Defendants fail to raise a substantial question regarding whether the ANDA Products meet the fluoride limitation of the claims at issue in the '565 Patent, *i.e.*, that the ANDA Products contain "fluoride in an amount of 0.0001 µg to 2.7 µg per 1 mL of the injectable composition." Plaintiff, through the expert declaration of Dr. Cizdziel, presents evidence that, despite the ANDAs' ███████ ████████████████████████ it is likely the ANDA Products contain fluoride in the claimed range because ████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████, they very likely contain levels of fluoride within, not above,[19] the claimed range. (ECF No. 95 at 13–16.) The Federal Circuit has upheld both preliminary injunctions showing likelihood of infringement and actual findings of infringement based on expert testimony explaining chemical processes and their likely results. *See Martek*, 579 F.3d at 1372–73 (affirming jury verdict and denial of motion for judgment as a matter of law based on expert testimony connecting scientific research to infringer's processes to conclude they reduced fermentation corrosion in an infringing manner); *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005) (upholding preliminary injunction where patentee's expert testified certain compound in alleged infringer's formulation would likely inhibit hydrolysis and noting "it is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that infringement can only be shown

---

[19] Dr. Cizdziel provides an additional reason why the fluoride levels in the ANDA Products likely do not exceed the claimed limitation: the FDA's "Division of Hepatology and Nutrition recommends a concentration limit for fluoride of no more than 0.5 µg/kg/day" because of the element's toxicity, thus a product seeking FDA approval would aim to keep fluoride levels consistent with this limit for safety reasons. (ECF No. 87 ¶ 67.)

through quantitative testing of an accused product"). Dr. Cizdziel's analysis, unrebutted by any expert declaration from Defendants, is similarly probative that the ANDA Products likely infringe the relevant claims of the '565 Patent.

Defendants fault Plaintiff for "never test[ing] the source water used in Defendants' manufacturing processes," but Defendants do not dispute █████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████ Instead, Defendants attack Plaintiff's evidence about the prevalence of fluoride in India's groundwater, arguing the Ali 2019 and 2023 Articles show that, in some instances, groundwater in India is below 2.37 μg/mL of fluoride, but this argument is not persuasive for two reasons. First, while Defendants critique Dr. Cizdziel's logic, Defendants attempt to rebut an expert declaration with attorney argument, not their own expert, which the Court is inclined to treat as less authoritative than a credentialed expert. *See, e.g.*, *CryoLife, Inc. v. C.R. Bard, Inc.*, Civ. A. No. 14-559, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015) (granting preliminary injunction after finding patentee likely to defeat defendant's obviousness defense, as defendant supported it with only attorney arguments); *Allergan, Inc. v. Athena Cosms., Inc.*, Civ. A. No. 07-1316, 2013 WL 12141346, at *7 (C.D. Cal. Mar. 5, 2013) (granting summary judgment for patentee on infringement where defendant "proffer[ed] no rebuttal expert testimony or evidence other than its own conclusory statements"), *aff'd*, 738 F.3d 1350 (Fed. Cir. 2013); *Parker-Hannifin Corp. v. Champion Lab'ys, Inc.*, Civ. A. No. 06-2616, 2008 WL 3166318, at *7 (N.D. Ohio Aug. 4, 2008) (affirming patentee established "*prima facie* case of infringement" through expert declaration where, "[i]nstead of offering a rebuttal expert, defendant chose to merely challenge [the expert] opinion with a motion to strike and other attorney argument").

Second and moreover, the challenges Defendants raise to Dr. Cizdziel's analysis do not lead to the conclusions they claim. Defendants point to evidence that, in many parts of India, the groundwater supply has fluoride levels below 1.5 mg/L, and the groundwater in certain states may range below the values Dr. Cizdziel opined would be the necessary starting point to result in a level of fluoride below the claimed range. But those low levels appear to be outliers, based on the box-and-whisker diagram from the Ali 2023 Article, which shows the majority of data points are concentrated between 0.1 mg/L and 10 mg/L. (ECF No. 127-7, Ex. A, at 8.) As a result, it appears highly likely Defendants' ANDA Products start with a concentration of fluoride that their purification processes would be unlikely to bring below the claimed range, especially if other manufacturing steps add fluoride, as Plaintiff contends without real contestation from Defendants. *See Pfizer, Inc.*, 429 F.3d at 1377. Further, Defendants provide no evidence to indicate they source their water from the areas in India at the lowest fluoride levels in the Ali 2023 Article.

Nor does Plaintiff's failure to conduct "quantitative testing" on the ANDA Products to confirm their fluoride levels raise a substantial question as to Plaintiff's likelihood of success, particularly in light of the discovery disputes preceding this Motion; the Federal Circuit has cautioned against exactly that line of logic. *Id.*; *see also Spin Master, Ltd. v. E. Mishan & Sons, Inc.*, Civ. A. No. 19-9035, 2019 WL 6681563, at *16 (S.D.N.Y. Dec. 6, 2019) (granting preliminary injunction despite inconclusive testing by defendants' expert).

Because Plaintiff has shown it is very likely the ANDA Products meet every element of claims 1, 8, and 9 of the '565 Patent, and Defendants fail to raise a substantial question that casts doubt on their infringement, the Court finds Plaintiff is likely to succeed on the merits of its literal infringement claims. *See Tinnus Enters.*, 846 F.3d at 1202.

### b.  Induced Infringement of '957 Patent

Typically, to prevail on a claim of induced infringement, "direct infringement is a necessary predicate." *Vanda Pharms.*, 887 F.3d at 1129. The plaintiff must establish "the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged," which can be shown through circumstantial evidence. *Id.* (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)). The Federal Circuit has held an ANDA's proposed label can constitute evidence of the applicant's "affirmative intent to induce infringement" if "the proposed label instructs the users to perform the patented method." *Id.* (quoting *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010)). Filing a Hatch-Waxman lawsuit allows the patentee to frame the inducement claim as forward-looking, since the allegedly infringing product is not yet on the market, and therefore the patentee "can satisfy its burden to prove the predicate direct infringement by showing that if the proposed ANDA product were marketed, it would infringe the [patent-in-suit]." *Id.* at 1130.

Defendants do not explicitly contest Plaintiff is likely to succeed on the merits of these claims. (ECF No. 126.) Having found Plaintiff is likely to succeed on the merits of its direct infringement claims for the '565 Patent, it is also likely Defendants will directly infringe "the injectable composition limitations of claims 1, 6, and 9 of the '957 [P]atent." (ECF No. 95 at 19.) Because Defendants' ANDA labels are materially identical to Plaintiff's and recite essentially the same steps for administration of the ANDA Products, they constitute evidence of Defendants' affirmative intent to induce infringement of the claimed methods. *See Vanda Pharms.*, 887 F.3d at 1129. Therefore, Plaintiff is likely to prevail on the merits of its induced infringement claims.

40

## B. Likelihood of Irreparable Harm

Plaintiff asserts it will suffer immediate and irreparable harm if not granted a preliminary injunction for several reasons. First, having established a likelihood of success on the merits, Plaintiff contends it is entitled to a presumption of irreparable harm. (ECF No. 95 at 27 (citing *BorgWarner, Inc. v. Dorman Prods., Inc.*, Civ. A. No. 09-11602, 2009 WL 4885009, at *5 (E.D. Mich. Dec. 11, 2009); *E.I. du Pont de Nemours & Co. v. MacDermid, Inc.*, Civ. A. No. 06-3383, 2007 WL 2332161 (D.N.J. Aug 13, 2007)).)

Second, Plaintiff argues that, absent an injunction, Defendants will flood the markets with generic products, at a fraction of the cost of Plaintiff's, not only eroding Plaintiff's sales and the prices it could charge for the Selenious Acid Injections before a trial on the merits could occur, but also disrupting Plaintiff's status as the exclusive maker of such products in a manner that would be impossible to quantify or rectify. (*Id.* at 27–28.) Specifically, Plaintiff points to Federal Circuit and district court law indicating that, where a patentee faces infringement by a "direct competitor," its lost revenue, market share, and brand status constitute irreparable harm. (*Id.* at 30 (citing *Systemation, Inc. v. Engel Indus., Inc.*, 194 F.3d 1331, 1999 WL 129640, at *6 (Fed. Cir. 1999); *Visto Corp. v. Seven Networks, Inc.*, Civ. A. No. 2:03-333, 2006 WL 3741891, at *4 (E.D. Tex. Dec. 19, 2006); *Arlington Indus. v. Bridgeport Fittings, Inc.*, Civ. A. No. 3:06-1105, 2011 WL 2927817, at *10 (M.D. Pa. July 18, 2011)).)

Plaintiff argues Defendants' entrance would likely disrupt ███████████ ███████████████████████████████ █ ███████████████████████████ ███████████████████████████████████████████████

---

[20] According to Plaintiff, ████████████ ███████████████████████████████████████████████████████ (ECF No. 95 at 29.)



(*Id.* at 32–33.)

(*Id.* at 34.) As a result,

, and with "up to fourteen" generic products on the market, it would be extremely challenging to quantify the lost profits attributable to any one generic producer, rendering money damages difficult to ascertain. (*Id.* at 33–34 (citing *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).) And Plaintiff argues entry of lower-priced generics will cause "irreversible price erosion and lost market share" that is "not easily compensable." (*Id.* at 34–35 (citing *Celsis In Vitro, Inc., v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996)).) Because several Defendants are small companies and/or located overseas, Plaintiff also expresses concern that, were it to obtain a court order for damages for infringing sales, certain Defendants might be unable to pay or fall outside of this Court's jurisdiction to compel. (*Id.* at 37.)

Additionally, Plaintiff asserts generic entry by Defendants would substantially impact its standing and reputation in the marketplace,

. (*Id.* at 28–29.) Plaintiff cites

████████████ Plaintiff argues the dissolution of ████████████ would impact its overall business opportunities for all products in its portfolio, as it contends lower sales of the Selenious Acid Injections, ████████, would lead to decreased interest in its other products, as well as a diminished ability to invest in research and development in the field of parenteral nutrition. (*Id.* at 35–36.) Plaintiff also asserts it could suffer reputational harm in the eyes of "purchasers and patients" if generic producers enter the market at lower prices but then withdraw because Plaintiff prevails in enforcing its patent rights. (*Id.* at 37.)

Plaintiff further argues there is a sufficient causal nexus between Defendants' infringement of the patents-in-suit and its irreparable harm because there is a clear connection between "the patented features and demand for the infringing product[.]" (*Id.* at 37 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641 (Fed. Cir. 2015)).) Plaintiff claims the compositions and methods from the patents-in-suit, which were key to the FDA's approval of the Selenious Acid Injections as safe for parenteral nutrition, are what Defendants seek to emulate in the ANDA Products, and consumer demand for the product cannot be attributed to marketing or other factors. (*Id.* at 37–38.) Similarly, Plaintiff contends the harms it describes if Defendants are allowed to go to market "will be a direct result of the generic Defendants targeting [Plaintiff]'s customers with an infringing equivalent to [Plaintiff]'s Selenious Acid." (*Id.* at 38.)

Defendants counter that Plaintiff's alleged harm from a pre-trial launch of their products is "highly speculative" and easily remedied by money damages, counseling against a preliminary injunction. (ECF No. 126 at 24.) Defendants refute Plaintiff's contention a showing it is likely to succeed on the merits creates a presumption of irreparable harm, quoting a court in this District as holding "[i]rreparable harm must be established as a separate element, independent of any showing of likelihood of success." (*Id.* (quoting *Sebela Int'l Ltd. v. Actavis Lab'ys FL, Inc.*, Civ. A. No. 17-

4789, 2017 U.S. Dist. LEXIS 175318, at *7–8 (D.N.J. Oct. 20, 2017)).) Further, Defendants argue

all the harms Plaintiff asserts it will suffer—price erosion, loss of market share, harm to Plaintiff's

reputation and goodwill, and overall harm to Plaintiff's business—amount to "purely economic

injury," which cannot be considered irreparable. (*Id.* at 25 (citing *Frank's GMC Truck Ctr., Inc. v.*

*GMC*, 847 F.2d 100, 102 (3d Cir. 1988); *Acierno*, 40 F.3d at 655).) Defendants reference cases

from the Federal Circuit and this district they contend reject the view that price erosion and loss

of market share are non-economic harms and find them to be compensable by money damages.

(*Id.* at 26 (citing *Nutrition 21 v. United States*, 930 F.2d 867, 870–71 (Fed. Cir. 1991); *Eli Lilly &*

*Co. v. Am. Cyanamid Co.,* 82 F.3d 1568, 1578 (Fed. Cir. 1996); *Altana Pharma AG v. Teva Pharms.*

*USA, Inc.,* 532 F. Supp. 2d 666, 682 (D.N.J. 2007); *Novartis Pharms. Corp. v. Teva Pharms. USA,*

*Inc.*, Civ. A. No. 05-1887, 2007 U.S. Dist. LEXIS 65792, 2007 WL 2669338, at *14 (D.N.J. Sept.

6, 2007)).) Citing their economic expert, Dr. DeForest McDuff, Defendants argue generic entry in

the pharmaceutical market "is typical and expected," and thus the resultant harm is "quantifiable"

based on accepted modeling of the "impacts and dynamics of generic entry" in the market. (*Id.* at

27.) Defendants assert Plaintiff's own data on sales of the Selenious Acid Injections from its five

to six years of market exclusivity will allow it to "reasonably calculate and quantify any lost profits

or other injury attributed to Defendants' launch of competing products" and determine each

Defendant's proportional responsibility. (*Id.* at 27–28.) Defendants also contend the ███████

████████████████████████████████████████ will make it easier to determine the

impact of generic market entry. (*Id.* at 28.)

  Additionally, Defendants argue Plaintiff does not meet its burden to demonstrate its ████

████████████████████████████████████████ and thus

constitute irreversible harm. (*Id.*) First, Defendants fault Plaintiff's reliance on a declaration from

Joann Gioia, "a long-time employee and executive of [Plaintiff]," to describe the terms of these agreements without providing the contracts as exhibits and argue this prevents Defendants and this Court from verifying their characterization of the terms is accurate. (*Id.* at 28–29.) Second, Defendants contend Plaintiff's claim that it would be forced to lower its prices in response to generic entry is speculative and assert name-brand pharmaceutical makers often maintain or raise prices in response. (*Id.* at 29.) Because of its ███████████████ Defendants assert Plaintiff ████████████████████████████████████████████ ███████████████ (*Id.*) Since Plaintiff would be the sole supplier of Selenious Acid Injections again if it prevails, Defendants also argue its concerns about ███████████████████ ███████████████ are overstated, as it will once again have the full leverage of being the only FDA-approved product on the market. (*Id.* at 30.)

Defendants also claim the reputational and other business impacts Plaintiff asserts it will suffer are not sufficiently supported. (*Id.* at 31.) In response to Plaintiff's contention it will be hindered in its business operations, including research and development, Defendants argue courts have rejected these harms as supporting preliminary injunctive relief. (*Id.* citing *Eli Lilly*, 82 F.3d at 1578; *Sebela Int'l*, 2017 U.S. Dist. LEXIS 175318 at *21–22).) Moreover, Defendants assert the proportion of overall revenue Plaintiff receives from the Selenious Acid Injections was ███████████ █████ so a loss in revenue on those products would not "materially change[]" its operations. (*Id.* at 31–32.) Similarly, Defendants contend Plaintiff provides no specific evidence of how sales of its other products would be impacted by any decline in Selenious Acid Injections sales, including no evidence of ████████████████████████████ would be affected. (*Id.* at 32.) Finally, Defendants argue Plaintiff will not suffer a loss of goodwill or reputation in its customers' eyes because it primarily sells to █████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████ and are unlikely to

hold a return to pre-entry pricing against it. (*Id.* at 33.)

       In reply, Plaintiff reasserts it has met its burden to demonstrate irreparable harm. (ECF No.

131 at 15.) Plaintiff argues its unrebutted and sworn declaration by Ms. Gioia is sufficient to attest

to the provisions of ████████████, but it also submits a second declaration from Ms. Gioia

with ██████████████████████████████ (*Id.* at 15–16 (citing ECF Nos. 131-

30, 131-31, 131-33, 131-34).) Attached to Ms. Gioia's second declaration are two examples of

significantly redacted ████████████, with what Plaintiff contends still has the relevant terms

visible. (ECF Nos. 131-31–34.) Plaintiff also refutes Defendants' assertion its ████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████ (*Id.* at 16 (citing ECF No. 131-34 at 4).) As a result, Plaintiff contends

it would take years to reach pre-suit levels. (*Id.*) Plaintiff also critiques Defendants for ignoring

the "downstream harms" of ████████████████████████, including that it would be

statutorily required to lower prices ████████████, and that customers would resist a

subsequent price hike. (*Id.* at 16–17.) Plaintiff reiterates harms such as price erosion, loss of

goodwill, and downstream portfolio and product development impacts have been recognized as

not quantifiable by courts, including where the customer market is ████████████. (*Id.* at 17.)

Further, Plaintiff argues it "cannot know or quantify whether it would have won or retained any

given contract . . . but for Defendants' premature infringing sales," and therefore its damages are

not calculable. (*Id.* (citing *Trebro Mfg.*, 748 F.3d at 1170).) Additionally, Plaintiff contends

Defendants' argument that it will not face unique harms because "all branded products eventually

face competition" is not sound because otherwise "no brand company could ever show irreparable harm from entry of an infringing generic product," despite a patent's conferral of "exclusionary rights." (*Id.* at 18 (quoting *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383–84 (Fed. Cir. 2006)).) Finally, Plaintiff asserts ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ and moreover "says nothing about whether that harm can be rectified." (*Id.* (quoting *Robert Bosch*, 659 F.3d at 1152).)

At oral argument and in their post-hearing brief, Defendants argue Plaintiff's provision of ████████████████████████████████████████████████ does not satisfy Plaintiff's burden to show irreparable harm. (ECF No. 171 at 8–9; ECF No. 170–2 at 80:14–86:25.) Among other problems, Defendants highlight that one of the provided contracts has ████████████ ████████████████████████████████████████████████████████ ███████████████████████ therefore, they and the Court have no way of knowing if the ██████████████████████████████████████████. (ECF No. 171 at 9.) Defendants also argue ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. (*Id.*) Because Defendants contend Plaintiff has provided "no justification" for its redactions, Defendants argue the Court should give the contracts "little to no weight" and find they are insufficient to demonstrate irreparable harm. (*Id.*)

In response, Plaintiff asserts Defendants had over a month after Plaintiff filed the redacted ▮▮▮▮▮▮▮▮▮ to request unredacted versions and did not, preferring to "speculate that the terms . . . were not actually as they appeared in the redacted copies." (ECF No. 170 at 9.) Plaintiff argues these assumptions are faulty because the copies it provided are "consistent with Ms. Gioia's sworn declaration," and Defendants' economic expert does not contest her statements about the contracts' impact. (*Id.*) Plaintiff also argues a court in this District has granted a preliminary injunction based on the unique dynamics of markets controlled by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Plaintiff asserts generic entry creates irreparable harm even absent "additional pressure from ▮▮▮▮." (*Id.* at 10 (citing *Novartis Pharms. Corp. v. Accord Healthcare Inc.*, Civ. A. No. 18-1043, 2019 WL 2588450, at *4 (D. Del. June 24, 2019)).)

Following the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006), there is no longer a presumption "that harm from patent infringement [is] irreparable. . . . The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009); *see also Robert Bosch*, 659 F.3d at 1149 ("We take this opportunity to put the question to rest and confirm that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief."). But though a patentee's right to exclude does not provide sufficient justification to enjoin in and of itself, "it should not be ignored either." *Robert Bosch*, 659 F.3d at 1149. The patentee must also demonstrate a causal nexus between the infringing feature of the defendant's product and the harm felt, *i.e.*, that "the patented feature [drives] the demand for the product." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1360 (Fed. Cir. 2012).

To make a showing of irreparable harm, "[e]vidence of potential lost sales alone" is not enough; the patentee must demonstrate "no amount of monetary damages, however great, could address the harm." *Metalcraft*, 848 F.3d at 1368 (holding district court did not err in finding loss of customers with potentially "far-reaching, long-term impact on [patentee's] future revenues" and "'ecosystem' effects" of switch between producers would be difficult to calculate and constituted irreparable harm). The Federal Circuit has identified several means by which a patentee may show a non-compensable harm, summarized aptly by a court in this District in *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, 2016 WL 5348866 at *13:

> "[P]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro*[, 664 F.3d at 926]. Loss of market share, for example, "constitutes irreparable injury because market share is so difficult to recover." *Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1322 (N.D. Ill. 1991), *aff'd*, 945 F.2d 416 (Fed. Cir. 1991). Price erosion, because of the difficulty of reversal, may constitute irreparable harm. *Canon, Inc. v. GCC Intl Ltd.*, 263 [F.] App'x. 57, 62 (Fed. Cir. 2008). The right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the competitive foothold that the infringer will gain. *See Systemation, Inc. v. Engel Indus., Inc.*, 194 F.3d 1331, 1999 WL 129640 at *6 (Fed. Cir. 1999).

*Id.*; *accord SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*, No. 2023-1058, 2024 WL 358136, at *3 (Fed. Cir. Jan. 31, 2024) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are examples of possible grounds for finding irreparable harm.").

To demonstrate harms related to price erosion and loss of market share are incapable of calculation, the patentee must offer evidence the alleged infringment has resulted or will result in irregular or hard-to-predict impacts on its pricing, sales, or customer relationships. *Compare Celsis In Vitro*, 664 F.3d at 930–31 (affirming irreparable harm finding where patentee offered expert testimony on loss of customers, forced changes to pricing policies, and effect of loss of exclusivity on brand reputation); *and Fresenius*, 2016 WL 5348866 at *13–14 (finding irreparable harm based

on direct competition from alleged infringer, unique market of product sold to "relatively small class" of GPOs with "market clout" to resist "a price rebound," and immature product market rendering impact of generic price cutting on market share "difficult to predict or quantify"); *with Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015) (determining patentee's predicted "loss of market share, sales, and/or price erosion" were "purely economic and reparable loss" based on patentee's expert stating consequences of generic market entry on losses were predictable, providing specific projections of loss resulting from competition); *and Sebela*, 2017 WL 4782807 at *7–8 (finding no irreparable harm where patentee able to calculate money damages from generic market entry to both patented drug and lost sales of other products and litigation history indicated patentee had business plan anticipating generic entry).

Upon review of the parties' briefings, supporting materials, and oral presentations, the Court finds Plaintiff will likely suffer irreparable harm absent a preliminary injunction. First, Plaintiff and Defendants are poised to be direct competitors in supplying selenium products for parenteral nutrition, a factor the Federal Circuit has found "suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (finding direct competition contributes to determination of irreparable harm even when patentee does not practice the patent); *see also Trebro Mfg.*, 748 F.3d at 1171; *In re Depomed Pat. Litig.*, Civ. A. No. 13-4507, 2016 WL 7163647, at *78–79 (D.N.J. Sept. 30, 2016) (considering direct competition by defendants' generic products, resulting in "lost market share, lost revenue, and [plaintiff's] business suffering," as evidence of irreparable harm supporting injunction), *aff'd sub nom. Grunenthal GMBH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019).

Second, sales of Plaintiff's Selenious Acid Injections rely substantially ████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████ ECF No. 95 at 28–29.) Because of this dynamic, Plaintiff will be particularly affected by

the entrance of even one generic competitor and the potential "ecosystem effects" of losing one

█████████████ will be difficult to quantify, as will the impact on customer relationships and

goodwill should Plaintiff prevail and try to reestablish its original pricing. *Metalcraft*, 848 F.3d at

1368; *see also Celsis In Vitro*, 664 F.3d at 930 (upholding district court finding of irreparable harm

including "damage to ongoing customer relationships, loss of customer goodwill (*e.g.,* when an

effort is later made to restore the original price), and loss of business opportunities"). And Plaintiff

indicates these dynamics are likely to immediately and irreparably impact its business because its

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████. (ECF No. 95 at 32.) Without an injunction, therefore, Plaintiff is likely

to suffer not only from stubborn price erosion, but also damage to customer relationships, loss of

goodwill, and loss of future business opportunities. *See Metalcraft*, 848 F.3d at 1368 ("Because of

its variable and uncertain nature, th[e] loss [of customers] is very difficult to calculate."); *Celsis*

*In Vitro*, 664 F.3d at 930; *Fresenius*, 2016 WL 5348866 at *14.

Defendants take issue with Plaintiff's argument for unquantifiable price erosion because they contend the contract examples Plaintiff provided do not clearly demonstrate Plaintiff would be unable to return to pre-generic pricing if it prevails (ECF No. 171 at 9),[21] but this argument is unavailing. As the *Fresenius* opinion describes, █████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. *See Fresenius*, 2016 WL 5348866 at *14. Though Defendants argue the unredacted portions of ████████████ Plaintiff provided do not clearly ████████████████████████████████████████████████████████ ██████ (ECF No. 171 at 9), Defendants do not dispute that at least one of the contractual terms provided allows ████████████████████████████████████████████ ████████████████████████████████████████████████████████ (ECF No. 131-33 at 3).[22] Defendants fairly point out it is unclear whether ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.[23] (ECF No. 131-31 at 6–7.) But in light of

---

[21] While not cited in the parties' briefs, the Court is aware of the Federal Circuit's opinion, relying on Third Circuit law, in *Warner Chilcott Lab'ys Ireland Ltd. v. Mylan Pharms. Inc.*, 451 F. App'x 935, 939 (Fed. Cir. 2011) (finding failure to grant party's request for evidentiary hearing on disputed facts was error necessitating vacatur of preliminary injunction). Defendants did not request an evidentiary hearing as to the contents of ████████████████, but rather argued the Court should give the examples provided little to no weight. (ECF No. 171 at 9.) As an unpublished opinion, *Warner Chilcott* is not binding on this Court and would not bind the Federal Circuit on appeal. *See* Fed. Cir. R. of Prac. 32.1(d) ("The court . . . will not give one of its own nonprecedential dispositions the effect of binding precedent.").

[22] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (ECF No. 131-33 at 3.)

[23] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

the clear language in the other exemplar contract, this concern is somewhat of a red herring, ███

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████

     The Court also finds a sufficient causal nexus between the irreparable harm and the potential infringement by Defendants. *See Apple*, 78 F.3d at 1360. Because the ANDA Products seek to replicate key features of the Selenious Acid Injections (ECF Nos. 94-3–94-5), including those targeted to safety and efficacy that "drive consumer demand" for Plaintiff's products and led to its FDA approval (ECF No. 95 at 37–38), and are likely to infringe the patents-in-suit, *see supra*, the irreparable harm Plaintiff faces stems from that infringement, *see Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 872–73 (Fed. Cir. 2017) (affirming causal nexus existed where district court found patent subject matter integral to product described in defendant's ANDA). Therefore, Plaintiff is likely to suffer irreparable harm attributable to Defendants' infringement of the '565 and '957 Patents.

---

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████

### C.  Balance of Equities and Public Interest

Plaintiff also contends the balance of equities and the public interest favor granting a preliminary injunction against Defendants. Regarding the potential hardships both sides might suffer, Plaintiff argues courts have found "minimal hardship to the alleged infringer where it is . . . not yet on the market (as here)," so Defendants will not suffer "undue losses" if they delay entry until a decision on the merits is reached. (*Id.* at 38 (citing *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996); *Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002); *Glaxo Grp. Ltd. v. Apotex, Inc.*, 64 F. App'x 751, 756 (Fed. Cir. 2003)).) Plaintiff also asserts Defendants knew of the patents-in-suit and challenged their validity through their paragraph IV notices, and thus took a "calculated risk" by attempting to go to market. (*Id.* at 39.) Finally, Plaintiff argues a preliminary injunction would cause Defendants "no more harm" than the typical 30-month stay in Hatch-Waxman litigations. (*Id.* at 39–40.) Regarding the public interest, Plaintiff argues there is a strong public interest in protecting a patentee's property rights and encouraging investment in drug research and development, as the public benefits from Plaintiff's innovative Selenious Acid Injection. (*Id*. at 40.) Plaintiff cites case law to assert this interest does not diminish simply because Defendants will offer lower-priced, generic versions, as this does not demonstrate a "critical public interest" a preliminary injunction would injure. (*Id.* (quoting *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)) (citing *Pfizer*, 429 F.3d at 1382–83; *Hoffman-LaRoche v. Cobalt Pharm.*, Civ. A. Nos. 07-4539, 07-4540, 08-4054, 2010 WL 4687839, at *13 (D.N.J. Nov. 10, 2010)).)

For their part, Defendants assert they will suffer significant harm outweighing Plaintiff's should the Court issue a preliminary injunction. (*Id.* at 33–34.) Defendants contend they have

committed significant resources to prepare to launch their ANDA Products, and the value of these investments "may be diminished and impossible to recover" if enjoined, while Plaintiff "appears to have already earned well in excess of its investment." (*Id.*) Defendants also argue the harm they face is greater than in the typical Hatch-Waxman case because only FDA approval (and not a 30-month stay)[24] stands in the way of their launch, and an injunction may prevent them from seizing a "declining market opportunity," as sales of Selenious Acid Injections are decreasing annually. (*Id.* at 34.) Defendants also argue denying the Motion is in the public interest because it would provide access "low-cost generic versions of a selenious acid product," which currently costs █████ ████████ based on Plaintiff's monopoly. (*Id.* at 35.) Because Plaintiff obtained FDA approval for the Selenious Acid Injections in 2019, Defendants contend it has had "amply opportunity to . . . realize a return on its investment," and Defendants' market entry as generics "will confer a substantial financial benefit to patients" while making the drug more widely available, in furtherance of Hatch-Waxman's goal of quickly bringing generics to market. (*Id.* at 35–37.)

"A party seeking a preliminary injunction must establish that 'the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Metalcraft*, 848 F.3d at 1369 (quoting *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016)). The district court exercises its discretion to balance the harm to the moving party without the injunction against that to the non-moving party if granted. *See id.* (upholding preliminary injunction where patentee would suffer by "being forced to compete against its own patented invention" outweighing

---

[24] Defendants also assert the lack of a 30-month stay "is a mess of [Plaintiff's] own making" because it chose to pursue other claims in the same family of inventions before those covering the Selenious Acid Injections, and consequently "did not have a patent to list in the Orange Book . . . prior to Defendants filing their ANDAs." (ECF No. 126 at 34–35.) As discussed *supra*, however, at oral argument, the parties agreed the reason why there is no stay is irrelevant to whether a preliminary injunction should issue. (ECF No. 170-2 (Apr. 7, 2025 Hr'g Trans.) at 9:19–11:6.)

disruption to alleged infringer's business (internal quotations omitted)) (citing *Hybritech*, 849 F.2d at 1457; *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1234 (Fed. Cir. 1985)); *accord Apple Inc.*, 809 F.3d at 645–46 (affirming district court properly weighed equities in support of permanent injunction where "[defendant] will suffer relatively little harm . . . while [patentee] is deprived of its exclusivity and forced to compete against its own innovation"). In so doing, the court may consider "the parties' size, products, and revenue sources," as well as the centrality of the patented technology to the patentee's business, but may ignore "sunk development costs" by the alleged infringer. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862–63 (Fed. Cir. 2010) (affirming balance of hardships analysis and grant of permanent injunction by district court); *see also Anderson v. TOL, Inc.*, 927 F. Supp. 2d 475, 488 (M.D. Tenn. 2013) (finding balance of hardships favored preliminary injunction, noting "[w]here the harm to an alleged infringer from a preliminary injunction is self-inflicted, courts typically find that such harm . . . does not weigh against issuance of an injunction," and collecting cases in support). "In considering whether the public interest favors the grant of an injunction, the district court should focus on whether a critical public interest would be injured by the grant of injunctive relief." *Metalcraft*, 848 F.3d at 1369.

The Court finds the equities favor Plaintiff, as it is likely to suffer more harm if not granted a preliminary injunction. The Federal Circuit has recognized a distinct harm when a patentee is forced to compete against its own invention, as Plaintiff would be if Defendants' ANDA Products launched before trial. *See id.*; *Apple Inc.*, 809 F.3d at 646. In contrast, Defendants' theoretical harm if enjoined represents the kind of "sunk development costs" courts routinely discount in this balancing exercise. *See, e.g.*, *i4i Ltd.*, 598 F.3d at 862–63; *Anderson*, 927 F. Supp. 2d at 488. In addition, while not dispositive, the Court notes a preliminary injunction will be no more harmful

to Defendants than the typical 30-month stay in Hatch-Waxman litigations that Defendants would likely anticipate as part of their business strategy.

Regarding the public interest, the parties here "take the traditional positions of branded and generic pharmaceutical manufacturers," *Hoffmann-La Roche Inc.*, 2010 WL 4687839 at *13 (granting preliminary injunction following expiration of 30-month Hatch-Waxman stay), reflecting that Hatch-Waxman balances "the competing public interests of protecting valid patent rights and increasing competition in the pharmaceutical industry by facilitating the approval of generic versions of drugs," *Sebela*, 2017 WL 4782807 at *9. "Both interests are at stake in this case." *Id.* That said, Hatch-Waxman seeks to balance, rather than "entirely eliminat[e,] the exclusionary rights conveyed by pharmaceutical patents" with its pro-competition goals. *King Pharms., Inc. v. Sandoz, Inc.*, Civ. A. No. 08-5974, 2010 WL 1957640, at *6 (D.N.J. May 17, 2010) (quoting *Pfizer, Inc.*, 429 F.3d at 1382) (finding "public interest in protecting patent rights outweighs the public interest in low cost generic drugs," despite denying motion for preliminary injunction). Given the statutory framework seeks to balance these public aims, the Court finds no "critical public interest" will be "injured" by an injunction, *Metalcraft*, 848 F.3d at 1369, and enjoining Defendants may carry a slight public benefit by protecting Plaintiff's patent rights until the matter may be decided on the merits, *see, e.g., Eisai Co., Ltd v. Teva Pharms. USA, Inc.*, Civ. A. No. 05-5727, 2008 WL 1722098, at *12 (D.N.J. Mar. 28, 2008) ("[T]he public benefits most from the *protection* of patent rights because those who cannot afford the branded drug would not have eventual access to the generic drug if the brand manufacturer's patent were not adequately protected to ensure recovery of development costs and sufficient profit incentives.").

### D.  Necessity of a Bond[25]

Defendants argue the Court must require Plaintiff to post a bond if it grants a preliminary injunction and that the Court "should err on the high side." (ECF No. 126 at 28 (quoting *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000)).) In their supplemental briefing on bond amount, Defendants propose the Court impose a ████████ bond, based on Plaintiff's forecast for the market impact if one generic entered the market (Sun being the only Defendant with FDA authorization to date). (ECF No. 201 at 3–5.) Plaintiff asserts a bond is unnecessary, arguing Defendants bear the burden of establishing their entitlement to a bond and have not done so. (ECF No. 95 at 40 (citing *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 837–38 (Fed. Cir. 2020)); ECF No. 170-2 at 89:20–91:14; ECF No. 170 at 10; ECF No. 200 at 1–2.) Alternatively, Plaintiff argues the Court need only impose a nominal bond, citing to the Federal Circuit's decision in *LEGO* as an example of this approach. (ECF No. 200 at 1–2 (citing *LEGO*, 799 F. App'x at 837– 38).) While Plaintiff proposes more detailed calculations on a bond amount if the Court finds more than a nominal bond is necessary (though its proposed result is the same) (*id.* at 2–5), the Court first evaluates if it can dispense with determination of a bond amount entirely. Based on Third Circuit law, it cannot.

Federal Rule of Civil Procedure 65(c) ("Rule 65(c)") instructs courts to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court must "interpret this requirement strictly." *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015); *see also Zambelli Fireworks*

---

[25] On April 28, 2025, the Court requested additional briefing on the proper amount of a bond should preliminary injunction issue (ECF No. 190), which the parties filed on May 5, 2025 (ECF Nos. 200, 201).

*Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) ("Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary." (citation omitted)). "[W]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 175 (3d Cir. 2003) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 110 (3d Cir. 1988)). The "'extremely narrow exception' allowing for waiver of the bond requirement" exists "only 'when complying with the preliminary injunction raises no risk of monetary loss to the defendant,' and the District Court 'make[s] specific findings' in support of that conclusion." *Tilden Rec. Vehs., Inc. v. Belair*, 786 F. App'x 335, 343 (3d Cir. 2019) (citing *Zambelli*, 592 F.3d at 426). Otherwise, "[t]he District Court must set a bond even where the parties have neglected to raise the issue." *Id.*; *see also Zambelli*, 592 F.3d at 426 ("Rule 65(c) constrains a district court's authority to enter a preliminary injunction, making it contingent upon the posting of a bond. It does not impose any obligation on the parties to seek a bond.").

Accordingly, the Court finds a bond is necessary with its grant of a preliminary injunction. Plaintiff's authorities to the contrary come from courts outside the Third Circuit and its strict interpretation of Rule 65(c), which the Federal Circuit would apply should Defendants appeal. *Compare Tilden Rec.*, 786 F. App'x at 343 (holding district court must set bond even absent request of parties), *with LEGO*, 799 F. App'x. at 837–38 (applying Second Circuit law in determining defendant did not meet burden to establish basis for bond); *see also AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 982 (Fed. Cir. 2013), *as amended on reh'g in part* (Dec. 12, 2013) (applying Third Circuit law to determine whether retroactive increase in bond amount is proper); *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1550 (Fed. Cir. 1987) (noting Federal Circuit "appl[ies] the rule of the regional circuit where appeals from the district court would normally lie" on

procedural issues not specific to patent law). Indeed, this Circuit "ha[s] long held that the posting of adequate security is a 'condition precedent' to injunctive relief." *Scanvec Amiable*, 80 F. App'x. at 176 (quoting *Hopkins v. Wallin*, 179 F.2d 136, 137 (3d Cir.1949)).

Nonetheless, Plaintiff contends the necessary amount of a bond is effectively zero because "Defendants likely will have no profit and thus no losses while the injunction is in place," based on the calculations of its economic expert, Dana Trexler ("Trexler"). (ECF No. 200 at 2 (citing ECF No. 200-2 (Supplemental Trexler Decl.) ¶¶ 12–13, 27, 25).) Plaintiff asserts at least 10 generics would likely enter the market absent an injunction, which would engender a "substantial amount of price erosion" and consequently mean Defendants' production costs would exceed revenue "by nearly $300,000, resulting in a net loss." (*Id.* at 2–3.) Plaintiff also argues Sun's FDA approval does not alter the likely market dynamics because the injunction will not freeze the FDA approval process, and other Defendants could gain approval to sell their ANDA Products at any point.[26] (*Id.* at 3.) According to Plaintiff, this means many generics are "poised to launch at risk . . . well before there is a final decision on the merits . . . severely eroding prices" and resulting in net losses for the market participants. (*Id.* at 3–4.) But even if Sun were to demonstrate it could launch ahead of other generics and enjoy a period of profits before the market is further subdivided, Plaintiff asserts its profits would be minimal.[27] (*Id.* at 4.) Because there is already another generic

---

[26] Plaintiff notes that another company ████████████████████ Fresenius Kabi, also has FDA approval to launch, and ███████████████████████████████████████ ████████████████████ ECF No. 200 at 3 (citing ECF No. 200-2 ¶ 13 n.4).)

[27] Plaintiff notes Sun and the other Defendants had not previously put forward bond calculations and requested the opportunity to file a five-page rebuttal "should any Defendant attempt to establish its individual losses from an injunction for the very first time in its concurrently-filed bond brief" (*id.* at 4), a request it reiterated in a letter to the Court on May 6, 2025 (ECF No. 202). Counsel for Sun submitted a letter in opposition on May 7, 2025. (ECF No. 203.) The Court denied this request and finds it moot to the extent it is also made here. (ECF No. 204.)

besides Sun with FDA approval, and Sun is subject to ██████████, Plaintiff contends Sun could launch at earliest at the end of May, and into a market "with three FDA-approved selenious acid products," not just two. (*Id.*) Plaintiff also claims other Defendants ████████████ ██████████████████████████████████████████████████████████ where it would turn a profit before further generic entry eroded prices and erased its net gains. (*Id.* at 4–5.) Finally, Plaintiff asserts it is a solvent corporation that will be able to pay Defendants' damages should they prevail at trial, to the extent they demonstrate they would have had a net profit absent the injunction, further obviating the need for a security. (*Id.* at 5 (citing *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997); *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, Civ. A. No. 14-3103, 2015 WL 3559273, *8–9 (D. Minn. May 27, 2015)).)

Relying on Plaintiff's expected profits and market projections, which they contend is a permissible method of calculation under Third Circuit law, Defendants argue the Court should require Plaintiff to post a ███████████ bond. (ECF No. 201 at 3 (citing *Rsch. Found. v. Mylan Pharms., Inc.*, 723 F. Supp. 2d 638, 664 (D. Del. June 28, 2010); *Par Pharms., Inc. v. TWi Pharms., Inc.*, Civ. A. No. 11-2466, 2014 WL 3956024 (D. Md. Aug. 12, 2014)).) Defendants assert that because only Defendant Sun has FDA approval to date, Plaintiff's market forecast when there is only one generic entrant is the proper estimate for lost profits. (*Id.* (citing ECF No. 90 (First Trexler Decl.) Schedule 1).) Defendants therefore contend each market participant would earn a gross profit of ███████████ over twelve months and estimate an eighteen-month period between issuance of a preliminary injunction and a decision on the merits (roughly from May 2025 to October 2026), resulting in a forecast of ███████████ in net profits for each player. (*Id.* at 4.) Accounting for prejudgment interest at the prime interest rate of 7.5%, which Defendants argue is commonly applied in the Third Circuit, Defendants argue the total bond should be ███████████.

(*Id.* at 5 (citing *Amgen v. Amneal Pharms. LLC*, Civ. A. No. 16-853, 2021 U.S. Dist. LEXIS 191802, at *28 (D. Del. Oct. 5, 2021); *Takeda Pharms., U.S.A., Inc. v. W.-Ward Pharm. Corp.*, Civ. A. No. 14-1268, 2018 U.S. Dist. LEXIS 209405, at *21–22 (D. Del. Dec. 12, 2018)).) Defendants contend this amount is nonetheless low as compared to other bonds in pharmaceutical patent cases in the Third Circuit. (*Id.* at 5 n.11 (citing *AstraZeneca v. Apotex, Inc., et al.*, Civ. A. No. 08-1512, Dkt. 474 (D.N.J. Nov. 8, 2012); *Rsch. Found.*, 723 F. Supp. 2d at 664; *Nivagen Pharms., Inc. v. Amneal Pharms., Inc.*, Civ. A. No. 24-0846, Dkt. 63 (D. Del. Sept. 24, 2024); *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, Civ. A. No. 17-07111, Dkt. 136 (D.N.J. July 18, 2018)).) Lastly, Defendants reject Plaintiff's argument that they are likely to lose money on generic entry, rendering a bond unnecessary, because it assumes more than ten generic entrants will launch without concrete evidence to support that view. (*Id.* at 5.)

The Third Circuit requires a district court to provide "analysis as to the economic impact of" the preliminary injunction. *Globus Med.*, 605 F. App'x at 129; *see also Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 392 (3d Cir. 2021) ("District courts should engage in a case-specific analysis that accounts for the factual circumstances . . . and they should place on the record their reasons for setting a bond amount, so as to provide a meaningful basis for appellate review."). This is important because

> [t]he bond limits the liability of the applicant and sets the price it can expect to pay if the injunction was wrongfully issued, since there is no other legal or equitable means to recover against the applicant for a wrongful grant of the injunction (i.e., where the applicant does not prevail in the main action), other than the bond.

*Id.* at 391 (cleaned up). In other words, the bond is the sole protection of the enjoined party against the harm incurred if it ultimately prevails, and district courts have an obligation to ensure they provides adequate protection because "the consequences of wrongfully enjoining a defendant could be dire if a district court were to significantly underestimate the economic impact of an

injunction it issues." *Id.*; *see also Rsch. Found.*, 723 F. Supp. 2d at 664 ("[A]n improvidently enjoined party may collect damages *up to the value of the bond*, in the discretion of the district court." (emphasis added)); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, Civ. A. No. 3:06-1105, 2011 WL 4916397, at *4 (M.D. Pa. Oct. 17, 2011) ("Given that the only recourse against wrongful enjoinment is against the bond, courts often conclude that '[w]hen setting the amount of security, district courts should err on the high side.'" (quoting *Scanvec Amiable Ltd. v. Chang*, Civ. A. No. 02–6950, 2002 WL 32341772, at *3 (E.D. Pa. Nov. 1, 2002)).)

The parties here point to the same economic analyses by Trexler—her calculation of the "annual revenue per market participant" based on the number of generic entrants (ECF No. 90 Schedule 1)—but dispute how many market participants there will in fact be. Based on the evidence presented, the Court finds neither argument fully persuasive. As only two generic providers, Sun and Fresenius Kabi (which is not a defendant here), have received FDA approval, it cannot be the case the market for selenious acid projects will immediately have ten or more participants, as Plaintiff claims. While Plaintiff asserts other Defendants could obtain FDA approval ██████████████████, even if all remaining Defendants obtained approval on that timeline, this is less than ten, and Plaintiff provides no evidence to support its statement the would-be generic entrants not party to this litigation "could get final FDA approval at any time." (ECF No. 200 at 3–4.) That said, it is also unreasonable to assume a completely static two-party market of Sun and Plaintiff through the conclusion of a trial on the merits, particularly when Fresenius Kabi also has FDA approval[28] (ECF No. 200-3), and more than a dozen other ANDAs are under

---

[28] Defendants ask the Court not to credit Plaintiff's representations about ██████████████ ████████████████████████████████████████████████████████████████ (ECF No. 201 at 3 n.7.) Without assessing the veracity of this representation by Plaintiff, the Court recognizes that

review. The Court therefore finds it reasonable to assume there would be at least three generic producers set to launch "at risk" at the time when the injunction would issue, or shortly thereafter.

Based on the analysis by Plaintiff's economic expert, if there are four market participants (Plaintiff and three Defendants), each would likely take home revenue of ███████████ in a year. (ECF No. 90 Schedule 1.) Subtracting approximately ██████, what Trexler estimates to be each Defendant's total annual production costs (and which Defendants do not contest) (ECF No. 200-2 ¶ 27), the Court estimates each market participant's net profit would be around ███ ███. In this best-case scenario, therefore, three Defendants would each be entitled to that amount, for a total of ██████ over twelve months. Assuming Defendants are correct it will take this Court until October 2026 to decide this case on the merits, each Defendant would have six months to earn additional revenue, but the likelihood of other generics entering the market would also increase, thereby driving profits down. According to Trexler's analysis, a fourth entrant would ████████████████████████████████████ ██████████████,[29] and each additional market participant will shrink the collective net profits significantly until they cease to exceed costs.[30] The Court will therefore impose a bond of ████████, which should provide more than adequate protection for Defendants throughout

---

Fresenius Kabi has regulatory approval ███████████████████████████████████ ██████████████, it is likely that another generic producer could receive FDA approval between now and a merits decision.

[29] Trexler estimates that in a market with five participants (Plaintiff and four others), each one would earn approximately ████████ in annual revenue. With the same expected production costs (ECF No. 200-2 ¶ 27), each participant would net around ██████. Annual net profits for the four generic providers would thus be ████████.

[30] Defendants argue this latter conclusion by Trexler is flawed, but they accept her other analyses as supporting a monetary bond. (ECF No. 201 at 5.) The Court therefore assumes without deciding that there is some threshold at which the market for selenious acid products could become so flooded that producers no longer realize net gains.

the duration of the injunction. *See Mallet & Co.*, 16 F.4th at 391; *Arlington Indus.*, 2011 WL 4916397 at *5 (setting bond at full potential profit loss of enjoined defendant because "despite the substantial likelihood of success by [plaintiff], it is manifestly unjust to put the risk of loss of 75 percent of its damages on the party enjoined"). Should Defendants ultimately prevail on the merits of their invalidity or non-infringement defenses, they will still have to prove the amount of actual losses incurred. *See Arlington Indus.*, 2011 WL 4916397 at *5 (citing *Va. Plastics Co. v. Biostim, Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987)). Accordingly, the Court will require Plaintiff to post a ██████████ bond as a condition of issuing the preliminary injunction.

## IV.  CONCLUSION

For the reasons set forth above, and for good cause appearing, Plaintiff's Motion for a Preliminary Injunction (ECF No. 85) is **GRANTED**. An appropriate order follows.

Date: May 27, 2025

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**